595 F.2d 621
 17 Fair Empl.Prac.Cas. 409, 56 A.L.R.Fed. 1,
14 Empl. Prac. Dec. P 7658,
16 Empl. Prac. Dec. P 8290, 193 U.S.App.D.C. 236,
3 Media L. Rep. 2233
 The BILINGUAL BICULTURAL COALITION ON MASS MEDIA, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Mission Central
Co., Intervenor.
CHINESE FOR AFFIRMATIVE ACTION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, CBS, Inc., Intervenor.
 Nos. 75-1855, 75-2181.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued En Banc 14 Nov. 1977.
Decided 4 May 1978.
 On Rehearing En Banc.
 Nolan A. Bowie, Washington, D. C., with whom, H. Joseph Farmer, Washington, D. C., was on supplemental memorandum of Bilingual Bicultural Coalition on Mass Media, Inc., case No. 75-1855.
 Ellen S. Agress, New York City, for appellant Chinese for Affirmative Action, Charles M. Firestone, was on supplemental memorandum of Chinese for Affirmative Action, case No. 75-2181.
 Daniel M. Armstrong, Associate Gen. Counsel, Washington, D. C., with whom Roberta L. Cook and Sheldon M. Guttmann, Counsel, Washington, D. C., were on the supplemental memorandum for F. C. C.
 Ashton R. Hardy, Richard J. Bodorff, Henry C. Bowen and J. Tullos Wells, Washington, D. C., entered appearances for F. C. C.
 Eric L. Bernthal, with whom Harry M. Plotkin, Washington, D. C., was on supplemental memorandum, Ronald A. Cass, Charlottesville, N. C., for Mission Central Co., Intervenor.
 Thomas J. Daugherty, with whom Preston R. Padden, Washington, D. C., was on supplemental memorandum of amicus curiae Metramedia, Inc.
 Erwin G. Krasnow, Washington, D. C., with whom Melvin L. Reddick, was on brief, for amicus curiae Nat. Ass'n of Broadcasters.
 Michael H. Bader, with whom Raymond C. Fay and John M. Pelkey, Washington, D. C., were on brief, for amicus curiae Doubleday Broadcasting Co. Inc.
 Bernard Koteen, Washington, D. C., with whom Alan Y. Naftalin, Arthur B. Goodkind, Washington, D. C., Corydon B. Dunham, New York City, and Howard Monderer, Washington, D. C., were on memorandum of amicus curiae Nat. Broadcasting Co., Inc.
 Drew S. Days, III, Asst. Atty. Gen., with whom Walter W. Barnett, Atty., Dept. of Justice, Washington, D. C., was on brief, for the United States of America as amicus curiae.
 Earle K. Moore, New York City, was on brief, for amicus curiae the Office of Communications of The United Church of Christ.
 James M. Nabrit, III, with whom Eric Schnapper, New York City, was on brief, for amicus curiae the N.A.A.C.P. Legal Defense and Educational Fund, Inc.
 Collot Guerard, Washington, D. C., was on supplemental memorandum of amicus curiae Nat. Organization for Women National Women's Political Caucus Women's Legal Defense Fund.
 J. Roger Wollenberg, with whom Sally Katzen, and John H. Harwood, II, Washington, D. C., were on memorandum in response to a Question Raised in the Dept. of Justice amicus brief and on the Substituted Supplemental Memorandum of intervenor CBS, Inc.
 Ann Aldrich, Cleveland, Ohio, for Nat. Black Media Coalition and Nat. Latino Media Coalition as amicus curiae.
 Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 Concurring opinion filed by BAZELON, Circuit Judge.
 Opinion dissenting in part filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 WILKEY, Circuit Judge:
 
 
 1
 These cases require us to consider once again the extent to which the Federal Communications Commission (FCC) must investigate broadcasters' equal employment performance before it renews their broadcast licenses.[1] The FCC renewed the licenses of stations KCBS (AM), San Francisco, California,[2] and KONO (AM), San Antonio, Texas,[3] without holding a hearing concerning their alleged job discrimination. Chinese for Affirmative Action (CAA) and Bilingual Bicultural Coalition on Mass Media (BBC)[4] respectively challenge those renewals, contending principally that they should have been afforded discovery to gain facts to support their contention that hearings were required.
 
 
 2
 In Chinese, we affirm the FCC's license renewal order. In Bilingual II,[5] we conclude that the FCC had insufficient information to find that license renewal was in the public interest, and remand for further investigation of KONO's alleged employment bias. We decline to hold, however, that the FCC on remand must conduct further investigation by affording discovery to BBC. We hold, rather, that the FCC may conduct further investigation by any means it deems appropriate including but not limited to its own inquiries and discovery initiated by plaintiffs.
 
 
 3
 As becomes apparent in our discussion in Part II below ("Governing Principles"), the rationale we follow here has been formulated, analyzed and applied in several of our recent decisions. Most of the judges on this Court participated in one or more of the panels by which those decisions were rendered. Our opinion today, however, while in great part a recapitulation of principles by now established, is designed to state definitively the position of this Court on the issues raised and to govern related cases in the future.
 
 I. BACKGROUND
 
 4
 A. Chinese. On 1 November 1974 (CAA filed a petition to deny the license renewal application of KCBS radio,[6] contending Inter alia that the station had failed to provide Asians with equal employment opportunities. CAA cited no instances of actual discrimination, and relied instead on a showing of statistical disparity. Asian-Americans comprise over 6% Of the population of the San Francisco-Oakland Standard Metropolitan Statistical Area (SMSA);[7] as CAA pointed out, however, KCBS' annual employment reports[8] revealed that during most of the 1971-74 license term only one of the station's 84 employees was Asian. In view of this disparity, CAA asked that KCBS be directed to answer CAA's 98-question "Employment Questionnaire," in order that it could better evaluate the station's affirmative action plan.
 
 
 5
 On 27 November 1974 CBS filed its Opposition. It explained that KCBS had in fact employed ten Asians during the 1971-74 license term, but that, for various reasons, nine of these workers were omitted from, or improperly listed in, its annual employment reports.[9] CBS said that the station currently employed five Asians, representing 6.1% Of its workforce, and argued that it should not be required to answer CAA's questionnaire, which it termed "extremely lengthy and burdensome." CAA replied on 20 December 1974, contending primarily that more information was needed about the Asians KCBS assertedly had employed during the expiring license term.
 
 
 6
 The FCC agreed with this contention. Accordingly, it requested on 23 September 1975 that KCBS provide, for the eight Asians not included in the annual reports,[10] dates of employment and termination, description of positions held, and national origin and sex. On 3 October 1975 CBS sent this information to the Commission; it said that the station then employed three Asians (two females and one male, representing 3.6% Of its workforce), and explained the circumstances under which several former Asian employees had left.[11] CAA received a copy of this response.
 
 
 7
 The FCC's decision was adopted on 21 October and released on 6 November 1975. The Commission found that KCBS had employed numerous Asians during the 1971-74 license term, and that the station's overall minority and female employment ratios approached parity with the percentages of minority group members and women in the San Francisco-Oakland SMSA.[12] Minorities (including Asians) and women, moreover, found substantial representation in the station's professional positions.[13] On these facts, the Commission held that KCBS had complied with the FCC's "EEO rules and policies":[14]
 
 
 8
 The combination of licensee's current performance in hiring and promotion, as reflected on the 1975 annual employment report, and its explanation for the low numbers of Asian Americans appearing on reports for 1971-74, suffice to show that KCBS' EEO results numbers of protected-group employees, viewed in the light of an affirmative action program are within a zone of reasonableness, and that its past record, while characterized by high job turnover, reflects a willingness to hire minority individuals.
 
 
 9
 The Commission therefore without a hearing granted CBS' license renewal application for a three-year term; CAA's request for discovery was denied.
 
 
 10
 B. Bilingual II. On 21 July 1974 BBC filed a petition to deny the license renewal application of KONO radio, contending Inter alia that the station discriminated against Mexican-Americans in its employment practices. Like CAA, BBC cited no instances of intentional discrimination and relied upon a statistical analysis of the station's recent employment record. Although Mexican-Americans made up 44% Of the population of the San Antonio SMSA, the percentage of Mexican-Americans in KONO's workforce was only 16% In 1974 and 17% In 1975. BBC asked the FCC for permission to take discovery, by depositions and interrogatories, to determine the underlying reasons for these employment disparities. Subsequent pleadings filed by KONO and BBC disputed the need for discovery and the interpretation to be accorded the conceded statistical disparities. KONO contended that its minority employment percentages fell within a "zone of reasonableness; "[15] BBC contended that the disparities were so egregious as to constitute Prima facie evidence of employment discrimination.
 
 
 11
 The FCC's decision was adopted on 17 July and released 5 August 1975. The Commission first examined the station's employment statistics and concluded that they fell outside the "zone of reasonableness" in both 1974 and 1975.[16] Turning to KONO's recruitment policy, the FCC noted that the number of Mexican-American employees had remained almost stable since 1971, and concluded that the station's affirmative action plan was "passive". The plan, said the Commission, was "a mere guarantee of employment neutrality, lacking the type of vigorous, systematic efforts to widen the pool of minority job applicants contemplated by our rules."[17] Having found that KONO's minority employment was outside the zone of reasonableness and that its affirmative action plan was inadequate, however, the FCC nevertheless granted the station a full three-year license renewal without a hearing. The renewal was conditioned on the station's filing reports concerning its hiring practices and descriptions of its efforts to recruit minorities and women during the next 12 months.[18] BBC's request for discovery was denied as "repetitive in light of the additional filings required" as a condition of renewal.
 
 
 12
 C. Course of the Litigation. CAA and BBC respectively appealed the license renewals.[19] On 20 April 1977 a panel of this Court, expressing somewhat differing views, reversed both renewal orders, holding that the Commission erred in refusing to grant petitioners prehearing discovery on their claims of employment discrimination. On 27 June 1977 we ordered rehearing En banc and, in accordance with our rule, vacated the panel opinion.
 
 II. GOVERNING PRINCIPLES
 
 13
 The FCC is directed to renew broadcast licenses if it finds that renewal would serve the "public interest, convenience, and necessity."[20] From the outset, the Commission has recognized that the public interest is not served by licensees who engage in intentional employment discrimination.[21] This is not to say, of course, that the FCC in considering license renewals is charged with an undifferentiated mandate to enforce the antidiscrimination laws: the FCC is not the Equal Employment Opportunity Commission (EEOC), and a license renewal proceeding is not a Title VII suit. The Supreme Court has consistently held that "the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare," and that these words "take meaning from the purposes of the regulatory legislation."[22] In view of the purposes of its regulatory legislation, the FCC analyzes the employment practices of its licensees only "to the extent those practices affect the obligation of the licensee to provide programming that 'fairly reflects the tastes and the viewpoints of minority groups,' and to the extent those practices raise questions about the character qualifications of the licensee."[23]
 
 
 14
 In conducting these two analyses the Commission is concerned, respectively, with two distinct policies: Affirmative action and Anti-discrimination. In implementing its affirmative action policy, the FCC functions very differently from the EEOC, both in the type of inquiries it makes and in the types of sanctions it can impose. The EEOC aims primarily to remedy the effects of past discrimination; in its efforts to make aggrieved persons whole, it can invoke an array of Retrospective remedies, including reinstatement, promotion, and restoration of seniority or back pay. The FCC, by contrast, is concerned primarily with the future:[24] in its efforts to ensure that programming reflects minority interests, it invokes Prospective, administrative sanctions short-term license renewals and license renewals conditioned on reporting[25] which enable it to monitor broadcasters' progress in recruiting and hiring minority workers. Because its affirmative action policy is prospective, the Commission rarely designates license renewal applications for hearings solely to investigate substandard affirmative action performance.[26]
 
 
 15
 The FCC's concerns, however, cannot be wholly prospective: in implementing its anti-discrimination policy, the Commission of necessity must investigate broadcasters' past employment practices. A documented pattern of intentional discrimination would put seriously into question a licensee's character qualifications to remain a licensee: intentional discrimination almost invariably would disqualify a broadcaster from a position of public trusteeship. Where responsible and well-pleaded claims of discrimination have been made, therefore, the FCC may be required to hold a hearing to resolve these charges before granting a license renewal.
 
 
 16
 The grounds for holding a renewal hearing are spelled out plainly both in the statute[27] and in our decisions: a hearing is required when a petition to deny raises a "substantial and material questions of fact" or when the Commission for any reason is unable to find that license renewal will serve the "public interest, convenience, and necessity."[28] A petitioner's allegations must be both "substantial and specific;"[29] the "allegation of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits, . . . are not sufficient."[30] Evidence of actual discriminatory conduct in most cases will present a substantial and material question of fact warranting a renewal hearing.[31] Evidence of minor statistical disparities between the available minority workforce and a station's minority employment, standing alone, in most cases will not warrant a hearing.[32] Yet evidence of Substantial statistical disparity evidence that a licensee's minority employment is outside the "zone of reasonableness"[33] while it may not in itself necessarily require resolution at a hearing, should at least put the FCC on notice that more information is required before the license renewal application can be granted.[34] This is because a substantial statistical disparity, especially when coupled with a languishing affirmative action plan, raises questions as to whether the station's poor EEO performance owes to inadvertence, or to intentional discrimination.
 
 
 17
 If more information is required, the method by which it is to be gathered "is, of course, a matter for the Commission."[35] In Bilingual I, we said in dictum that "Some means for developing the reasons for statistical disparities" must be found, and suggested FCC-initiated inquiry and petitioner-initiated discovery as possible alternative solutions.[36] The FCC generally has elected to conduct its own inquiries,[37] and we specifically have approved of this course.[38] Before the Commission is obliged to conduct further inquiry, however, it must have before it either well-pleaded allegations of overt discrimination or statistical evidence of substantial underemployment of minority groups. Otherwise, the FCC will have sufficient information to find that license renewal is in the public interest and thus to grant renewal without a hearing.
 
 
 18
 Finally, then, we come to the question before us: whether the FCC in these cases had sufficient information to make an informed decision that the licensees had not engaged in intentional discrimination during the expiring license term. In answering this question, of course, " 'the scope of our review is quite narrow;' "[39] we sit to review two license renewal orders, not to restructure the FCC's information-gathering process. If the Commission's action in granting those renewals "was not arbitrary, capricious or unreasonable, we must affirm."[40]
 
 III. ANALYSIS
 
 19
 A. Chinese. In its petition to deny, CAA presented figures, drawn from KCBS' annual employment reports, showing that the station had employed only one Asian during most of the 1971-74 license term. These figures constituted statistical evidence of substantial underemployment of a significant minority group. The FCC thereupon was obliged either to conduct is own further inquiry or to afford CAA discovery to ascertain the reasons underlying this statistical disparity. The Commission pursued the former course. Its inquiry revealed that KCBS in fact had employed ten Asians during the 1971-74 license term and that a large majority of Asian employees at all times had held professional positions. Although the Commission apparently did not make a percentage analysis of Asian-Americans on KCBS' payroll, such workers comprised 6.1% And 3.6% Of the station's jobforce in 1974 and 1975 respectively. CAA did not dispute these figures.
 
 
 20
 Proceeding upon the facts before it, the FCC properly concluded that KCBS had employed a substantial number of Asian-Americans during the 1971-74 license term, that its employment figures for minorities in general fell within the zone of reasonableness,[41] and that its affirmative action program was effective.[42] In view of these findings, as well as the absence of any allegation of overt discrimination, the FCC properly concluded that no substantial and material question of fact had been raised and that renewal without prospective remedies was consistent with the public interest. The Commission therefore rejected CAA's request for discovery and summarily renewed the license.
 
 
 21
 For the first time on appeal to this Court, CAA contends that there remains one area of factual uncertainty which precluded an informed decision that renewal of KCBS' license was in the public interest. CAA points to the relatively high turnover of Asian employees at KCBS,[43] and argues that this evidences employment discrimination: the station's employment of Asians, it says, amounts to a mere "revolving door."[44] CAA contends that it should have been afforded discovery on this question.[45]
 
 
 22
 CAA's failure to make its "revolving door" argument before the Commission stems in part from the absence of regularized procedures governing the Commission's "further inquiry" in license renewal cases. In this case, the FCC did not request further information from KCBS until Nine months after the initial pleadings had been filed. Following this nine-month delay, the Commission adopted its final decision Only 15 days after receiving KCBS' response to its inquiry. Promptness of this order, we suspect, might well surprise more than one member of the FCC bar. Although CAA was, as it must be, provided with copies of the Commission's request and of KCBS' reply, it was not notified either of the proper procedures and timing for responding to the licensee's submission or of the FCC's intention to decide the case in 15 days. Under these circumstances, CAA's failure to raise the "revolving door" question a question that was suggested by the information KCBS furnished before the FCC reached its decision is quite understandable.
 
 
 23
 This is not to say, of course, that 15 days is necessarily too brief a span to allow for responsive submissions by petitioners. The point, rather, is that petitioners must be informed as to when subsequent pleadings must be received by the Commission if they are to be considered in its decision. The FCC must, if it has not already done so, adopt procedures that will afford petitioners like CAA reasonable time in which to comment on or rebut newly submitted evidence as well as reasonable notice of what the applicable deadlines are. Only under such procedures can petitioning groups be assured the meaningful opportunity to participate mandated by our decisions since United Church of Christ.[46]
 
 
 24
 Although the absence of appropriate FCC procedures may explain CAA's failure to present the "revolving door" argument to the Commission before the renewal decision was made, it did not relieve CAA of its obligation to seek FCC rehearing on this issue before raising it on appeal. Section 405 of the Communications Act states that the filing of a petition for rehearing is a condition precedent to judicial review of a Commission order if the petitioner "relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass."[47] The "revolving door" allegation presents a novel question of fact upon which the Commission has been afforded no opportunity to pass. Having failed to petition for rehearing in this case,[48] CAA cannot make this allegation here.
 
 
 25
 Apart from the procedural inadequacies that we have mentioned, we see no question but that the Commission acted properly, on the facts before it, in unconditionally renewing the KCBS license without a hearing. We accordingly affirm the FCC's decision.
 
 
 26
 B. Bilingual II. On the basis of the initial pleadings in the license renewal proceeding, the Commission found that KONO's employment of Mexican-Americans was outside the zone of reasonableness, that the percentage of Mexican-Americans in its workforce had remained "static" for four years, and that its affirmative action program was "passive." We think that these findings, taken together, created a factual uncertainty as to whether KONO had engaged in intentional discrimination during the expiring license term.
 
 
 27
 Yet the Commission refused either to grant BBC's request for discovery or to conduct its own inquiry into the "underlying reasons" for the employment disparities.[49] Instead, without making any findings as to employment discrimination, the Commission renewed KONO's license for a full three-year term, subject only to Future monitoring.
 
 
 28
 This was an abuse of discretion. On the initial pleadings before it, the FCC had insufficient undisputed factual information to conclude that renewal of KONO's license was in the public interest. We therefore remand this case in order that the Commission may get the facts concerning KONO's alleged employment discrimination; unless this factual uncertainty is resolved favorably to KONO, a hearing will have to be held before KONO's license can be renewed.[50]
 
 
 29
 The method by which this factual uncertainty shall be resolved is, as we often have said, up to the Commission.[51] We have neither the inclination nor the authority to command the FCC to adopt procedures that seem desirable to us.[52] As we noted earlier, the FCC generally has elected to resolve factual uncertainties by conducting its own inquiry, rather than by affording petitioners discovery.[53] For several reasons, this usually will be the preferable course: the Commission's questions are likely to be more expert, the licensee's answers more uniform and comparable. In addition, licensee cooperation is likely to be fuller and more prompt. Only if the FCC on remand is unwilling or unable to conduct its own inquiry is it under any obligation to afford discovery to petitioners here.
 
 
 30
 This does not mean, of course, that petitioners have no role to play should the FCC elect to proceed with its own inquiry. The full report of the Commission's investigation, including all evidence it receives, must be placed in the public record, and a stated reasonable time allowed for response and rebuttal by petitioners. These procedures will permit meaningful participation by petitioners without necessitating potentially burdensome discovery.
 
 
 31
 At oral argument, petitioners contended that the FCC inquiry could never be wholly adequate: discovery by BBC would be needed in any event to test the veracity of KONO's representations. This argument plainly proves too much. As a matter of logic, it leads inexorably to the conclusion that discovery must be permitted Whenever a petition to deny is filed. The Commission considers over 3,000 license renewal applications each year;[54] to require that its 13 Administrative Law Judges assume the burden of passing upon the propriety of an inevitable host of interrogatories would create a regulatory nightmare.[55] Nor would it be necessary. Ample sanctions exist for false statements knowingly made to the Commission,[56] and licensees are well aware of their duty, not only to avoid positive untruths, but to "be scrupulous in providing complete and meaningful information."[57]
 
 
 32
 If any generalization can be extracted from this litigation, of course, it is not so much that the information available to the Commission may be untrustworthy, but that the information available to it may be inadequate. Since deciding Bilingual II, however, the FCC has taken substantial steps toward improving both the quantity and the quality of information concerning its licensees' EEO practices. In 1976 the Commission adopted a Model Equal Employment Opportunity Program, which requires licensees to provide detailed data about minority recruitment, hiring, training and promotion.[58] More recently the Commission announced Notice of a Proposed Rulemaking to consider revisions of the annual employment reports submitted by licensees.[59] These steps are to be highly commended, and will undoubtedly facilitate better informed license renewal decisions by the Commission.
 
 
 33
 Equally importantly, these steps will go a long way toward relieving the frustrations of which BBC in the instant case has complained. As we noted in Bilingual I, citizens groups challenging license renewals generally have limited resources and few procedural tools for gathering evidence about broadcasters' employment practices.[60] If such licensee is required to provide sufficient, publicly-available data on a continuing basis, interested and responsible parties can undertake the meaningful inquiry of their own without tying up FCC personnel or subjecting licensees to unnecessarily lengthy requests for discovery.
 
 CONCLUSION
 
 34
 The FCC's license renewal order in Chinese is affirmed. The FCC's license renewal order in Bilingual II is reversed, and the case is remanded to the Commission for proceedings in accordance with this opinion.
 
 
 35
 So ordered.
 
 BAZELON, Circuit Judge, concurring:
 
 36
 The Commission faces difficult and delicate problems in developing its equal employment opportunity policies toward "nondominant" minorities. Judge Robinson's opinion addresses a number of these problems with great thoughtfulness, and I am in accord with the tenor and purpose of much of what he says. However, it is my understanding that the court takes no final position today on such issues as the proper statistical treatment of "nondominant" minorities, and the appropriate role of post-term employment data. On this basis, I have joined the court's opinion. Nevertheless, I would hope that the Commission will heed Judge Robinson's remarks as it continues to evolve its approach in this critical area.
 
 
 37
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part:
 
 
 38
 I agree that the Federal Communications Commission is duty bound to investigate, by one means or another, substantial allegations that its licensees have engaged in employment discrimination,[1] and then to allow renewal-challengers "meaningful participation" in evaluating the fruits of that scrutiny.[2] And we will all agree that if the Commission is unwilling to seek relevant information itself[3] it must provide challengers with the opportunity to gain access to the evidence bearing on their charges.[4] Thus I join unreservedly in the court's opinion in these respects.
 
 
 39
 My difficulty with today's decision stems solely from the court's failure to utilize the occasion as an En banc body to review thoroughly the Commission's present philosophy toward employment discrimination by its licensees. This default is especially troubling in light of the court's professed endeavor "to state definitively the position of this Court on the issues raised and to govern related cases in the future."[5] Although I concur to the result in Bilingual II,[6] I think the court errs grievously in rejecting out of hand the allegations of employment bias in Chinese for Affirmative Action,[7] and in placing its imprimatur on the license renewal granted therein.
 
 
 40
 The statistical showing in Chinese, while not so compelling as that in Bilingual II, did establish a prima facie case of intentional racial discrimination when measured by normal evidentiary standards, from which neither the Commission nor the court has advanced any cause for departure. The Commission, however, gave those statistics only cursory examination on the thesis that the minority group involved is not dominant in the broadcast community and ultimately it disposed of the challenger's presentation on grounds that I can regard only as an effective abandonment of its equal-employment policies in the recent past. The court, in turn, ignores the Commission's stated rationale and substitutes another, and, even if it were not our duty to refrain from a displacement of that sort, I could not accept the court's unexplained conclusions. The court disdains both a hard look at the Commission's decision, and a rigorous study and elucidation of its own reasoning.
 
 
 41
 I must, then, dissent from the court's endorsement of the Commission's limitation of the coverage of its anti-discrimination rules to groups dominant in the licensee's service area. I must also demur to the court's condonation of Commission acceptance without even the seeds of a logical explanation of statistical disparities that naturally give rise to an inference of purposeful racial bias. I must protest, too, the court's undifferentiated use of the licensee's post-term statistics and similarly misleading factors in an effort to rebut that inference.
 
 
 42
 * The history of Commission concern over discriminatory employment practices in the broadcasting industry has been amply recounted elsewhere.[8] It is necessary here merely to highlight the evolution of current regulatory policy. In a 1968 statement of unusual eloquence, the Commission first indicated that it could not countenance racial distinctions,[9] and two years later this position was extended to gender differentiations as well.[10] An allegation that discrimination was a factor in an employment decision would, the agency reasoned, "in almost all cases where a substantial showing is made, require a hearing for its resolution" because "the matter is of such a serious nature as to call into question the basic grant of operating authority."[11] Never during the ensuing decade has the Commission overtly deviated from this fundamental concept,[12] and even today the court acknowledges that "intentional discrimination almost invariably would disqualify a broadcaster from a position of public trusteeship."[13]
 
 
 43
 The Commission has predicted its condemnation of disparate treatment on a number of grounds.[14] In 1976, the Supreme Court held that administrative agencies are not required by general public-interest considerations "to seek to eradicate discrimination,"[15] but it specifically noted that the Commission's interest therein "can be justified as necessary to enable (it) to satisfy its obligation under the Communications Act . . . to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups."[16] The Commission in turn has identified two related ways in which discrimination can frustrate that objective. First, the duty to ascertain and meet the programming needs of all segments of the community served is undercut when the licensee himself has indulged conspicuously in employment bias both because minorities might not bother to present their preferences to him and because he might well be insensitive to them.[17] Second, minority employees are more likely to originate programming that rectifies deficiencies encountered by their groups.[18] The Commission assumes, quite logically, that purposeful differentiation inexorably will have some or all of those untoward effects,[19] and thus does not demand a showing in each case that prohibited conduct actually affected programming.[20] The Commission has also declared that its rules prohibiting purposeful discrimination are required by its responsibility to foster the continuing good character of its licensees,[21] including the allied obligation to license only those who conform to federal and state law.[22] Thus, while neither is it the Equal Employment Opportunity Commission nor is it charged with enforcement of Title VII for its own sake, the Commission has perceived and pronounced that it can fulfill its special mandate only by a complete ban on race and gender discrimination.
 
 
 44
 And so, the Commission's antidiscrimination regulations are not gratuitous. The Commission has itself noted the substantiality of the argument that, all else aside, it has a constitutional duty not to sanction discrimination.[23] One need not approach the problem at hand on ground so high, however, for indubitably the Commission bears a statutory responsibility to consider information highly pertinent to the public interest, and, "(f)rom the outset," as the court notes, "the Commission has recognized that the public interest is not served by licensees who engage in intentional employment discrimination."[24] Consequently, the Commission is not free lightly to abandon its attentiveness to licensee prejudice in employment activity. It may exercise discretion in considering relevant factors, of course, but it cannot ignore any material contention fairly raised on that score.
 
 
 45
 More recently, the Commission has added a second distinct requirement to its antidiscrimination rules. Licensees must not only be racially neutral in employment decisions but also must make affirmative efforts to recruit, hire, train and promote women and members of minority groups.[25] The Commission has refined its directives in this area and has developed a model equal-employment-opportunity (EEO) program to guide licensees in discharging their affirmative-action obligation.[26] The Commission tells us "that its EEO rules are prospective in nature and, in most cases, (it) seek(s) to lead a licensee who lacked an adequate affirmative action plan in the past to adopt specific policies to ensure an active program in the future."[27]
 
 
 46
 While prospective orientation for the affirmative-action requirement is understandable,[28] we encounter difficulty here because the Commission apparently now seeks to extend the same treatment to its bar against intentional discrimination,[29] and that of course is another matter entirely. I am unable to comprehend how a completely prospectively-oriented antidiscrimination policy meets the Commission's own declarations of what the public interest demands, and at least on this point the court seems to be in accord.[30]
 
 
 47
 If, as the Commission found in 1968, licensees who purposely discriminate are unlikely to ascertain or satisfy the programming needs of minorities, it is hard to see how affirmative-action programs, even those to proceed at a more than deliberate pace, become a panacea for change of licensees' as opposed to their workforces' insensitivity to the programming tastes of significant segments of the broadcast audience.[31] Nor is such action calculated to modify basic character shortcomings although it might disguise them a bit. Two of the factors critically underlying the Commission's concern with willful employment discrimination are thus abandoned by a policy that looks only to the future.[32] And the Commission has made no attempt to explain its dramatic departure from past principles;[33] it merely asserts that this court approved the shift in NOW v. FCC.[34]
 
 
 48
 Our decision in NOW does not support that construction. There we determined initially that the Commission had acted reasonably in finding that allegations of past discrimination against women, in light of all the information before it, were insufficient to warrant a hearing.[35] We then analyzed the affirmative-action contentions and held that the Commission did not abuse its discretion by electing to push the existing licensee toward adequate execution rather than to confer the license upon someone who could only promise better performance in overcoming unintentionally-erected barriers to equal opportunity.[36] I consider the distinction drawn in NOW well founded, as I did when I joined in that decision, and the full court, as I read its opinion herein,[37] today adopts it. Nothing in NOW, however, supports the theses that the Commission is free to focus only upon assuring future compliance with its rules, that it may ignore the licensee's past activity or that, if that conduct is unacceptable and unmitigated, it may nonetheless extend the grant of public trusteeship. To the contrary, this court and, until recently, the Commission have steadfastly resisted such an abrogation of the policy set in motion just a decade ago by the Commission.[38]
 
 II
 
 49
 It is now far beyond dispute that broadcasters must not intentionally discriminate, and that past activity of that nature will justify, if not demand, nonrenewal of a communications license.[39] Still we are left with the problem of determining what showing is necessary to generate a "substantial and material (issue) of fact" statutorily requiring absent Commission efforts otherwise resolving the dispute[40] a hearing before the Commission properly may "find that grant of the application would be consistent with" the public interest.[41]
 
 
 50
 The type of showing most commonly attempted and that with which we deal here is statistical in nature. The Commission initially expressed distrust of statistics[42] but, before that misgiving was subjected to judicial scrutiny, the Commission purported to come around to the view that " '(i)n the problem of racial discrimination, statistics often tell much, and Courts listen.' "[43] Quite recently the Commission has declared that "a statistical prima facie case of employment discrimination may be made out by comparing the composition, by race and sex, of the company's staff with the city's labor force composition in general."[44] Indeed, because a statistical presentation is perfectly capable of supporting an inference of prohibited conduct, it would be irrational to ignore it totally.[45] Moreover, in the field of discrimination, it is my experience that statistics are recognized as a uniquely valuable type of evidence: "statistics are frequently the best available evidence of . . . discrimination"[46] because they are often "the only available avenue of proof."[47] Consequently, the pertinent question is not whether statistics will ever suffice, for they often will, but what level of statistically-indicated disparity will trigger an administrative investigation.
 
 
 51
 We held in NOW that the Federal Communications Commission may employ standards different from those utilized by the Equal Employment Opportunity Commission in carrying out its mandate.[48] That conclusion seems unassailable, especially in light of the Supreme Court's decision in NAACP v. FPC.[49] FCC's main retrospective concern as distinguished from its interest in prospective affirmative action is with intentional discrimination;[50] EEOC, on the other hand, is chartered to search out and remedy both discriminatory intent and discriminatory effect.[51] And not all statistics that indicate disparate impact raise an inference of prohibited design. Similarly, an EEOC charge against an FCC licensee will not necessarily require license denial if the charge implicates only untoward effects and not improper purpose.[52]
 
 
 52
 The Communications Commission must allocate its limited resources to a broad range of important responsibilities, of which the fight against job-bias is but one although certainly a vital one. Because any statistical showing leaves open the possibility, slight though it might be, that the disparity is due to chance,[53] the Commission may adopt a level of statistical significance[54] reasonably calculated to avoid exorbitant efforts over coincidental differentials what statisticians call "type of errors."[55] And more than that, because the Commission is concerned with long-term effects on the use of airwaves in the public interest and not with remedying isolated incidents,[56] it could perhaps ignore some differences that are significant but of small magnitude.[57] Disparities may often be attributable to the temporarily-undetected character flaw of a single personnel officer or employment agency, and not to licensee-approved or -condoned employment practices.
 
 
 53
 More broadly, all that statistics can ever show is that the null hypothesis that the composition of the licensee's labor force is the result of random distribution and that race and sex had no relationship to employment opportunity should be rejected.[58] Even though a disparity is statistically significant, it does not irrebuttably prove the reason for the difference, which could be any number of things intentional racism by employment officials,[59] a disinclination among minority-group members to seek media jobs, unintentional use of culturally-biased employment tests and standards or the lingering effects of past discrimination by educational institutions.[60] Thus, when the magnitude of disparity is relatively low in comparison with a convincing refutation of calculated bias, the Commission might conclude that the probability that a hearing would reveal a discriminatory intent is too insubstantial to justify an expenditure of precious resources.[61] But, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired."[62] The corollary is that where a long-term disparity is established and no satisfactory explanation is given, it ordinarily can be expected that intentional manipulation has been worked.
 
 
 54
 To list some of the factors that the Commission could employ in examining statistically-based license challenges is not to say that it has ever looked at any of them. And indeed it has not. So far as I am able to discern, it has merely adopted without explanation a test used by this court to review its own action; and more recently it has chosen again without offering any rationale whatever an apparently arbitrary cut-off figure. Though one might sympathize with the Commission's disinclination to understand and interpret an array of employment statistics, that is a duty that the Commission cannot and must not avoid. To be sure, the Commission has great discretion in choosing among policies to best implement the directives of the Communications Act. But having settled upon a policy, it must either implement it or discard it in a manner that is both well reasoned and well explicated.[63] Since the Commission has never expressly abandoned the policy announced in 1968, it is our duty to see that Commission practice in this field reasonably carries out the prohibition of intentional bias.
 
 
 55
 The Commission's decisional course has been to determine whether a particular disparity falls safely within a "zone of reasonableness,"[64] but the numerical boundaries of this zone were not set by the Commission until several months ago.[65] Before that time, the Commission's decisionmaking traded on what this court had tolerated as within a "zone of reasonableness" for we ourselves had coined the phrase in 1972.[66] Because we then upheld Commission approval, as a matter within the ambit of administrative judgment, of hiring practices resulting in minority employment at only about 29 percent of parity with minority representation in the general workforce,[67] the Commission seized on that troublingly low figure which had survived judicial scrutiny, but simply in the context of that particular lawsuit as a substitute for judgments tailored to the individual circumstances of other employment discrimination cases.
 
 
 56
 We, of course, do not directly assess the performances of licensees; that the Commission does, and we review the Commission. Thus the zone-of-reasonableness concept which we have applied in several cases,[68] and which the Commission has borrowed, started out as an appellate-court test of Commission judgmental action in examining licensees' conduct in choosing their employees, and not as an administrative yardstick for measurement of what the Commission must determine the consistency of that conduct with the public interest.[69] All we held in the first of that line of cases, Stone v. FCC,[70] was that in 1972 the Commission had not slipped into the zone of arbitrariness by holding that minority employment at 29 percent of parity did not give rise to a substantial question of intentional discrimination in a situation involving voluntary and active recruitment and placement by the licensee.[71] That certainly was not to say that the Commission reasonably could pivot its decisions in all of the myriad situations coming before it at the very edge of the naked statistics in that one case. As Stone itself illustrates, a particular ratio of minority employment to minority representation in the total workforce may portend different inferences when viewed against varying backgrounds and circumstances. And while the Commission must, of course, reach the same result in identical cases, the same bare statistics do not necessarily germinate identical or even similar situations, and the Commission too often has not visibly given attention to such nonstatistical factors as evidence connoting or negativing intent, or circumstances suggesting a need for renewal despite past employment improprieties or for nonrenewal in light thereof. In so doing, the Commission does not exercise discretion but simply concludes that statistical showings within a broad range cannot sufficiently indicate intentional discrimination. Decisions of that kind are statistically arbitrary since a figure as low as 29 percent of parity would usually give rise to a substantial inference of purposeful bias absent countervailing circumstances.[72]
 
 
 57
 We can and indeed we must indulge the Commission great latitude in deciding whether to designate a renewal application for investigation or hearing. But it goes without saying that the Commission may not yield to licensees the freedom to engage in willful misconduct. Thus the Commission must develop obediently to its responsibilities as guardian of the public interest in broadcasting its own framework for analyzing statistics, and as a court we must appraise its effort to determine whether it comports with the Commission's statutory duties.
 
 
 58
 The Commission has informed us that it will at least make further inquiry when licensee employment of minorities is less than 50 percent of parity with their percentages in the area workforce,[73] or when employment in upper-level positions[74] is less than 25 percent of parity.[75] Because this proposal is not at issue here, I have no need to discuss it, but I must note that it arrived unadorned with any explanation. This is the more discomforting because figures showing 50 percent of parity not to mention those indicating only 25 percent of parity would, both as a matter of common sense and of statistical science, often be significant and relatively large in magnitude.[76] I can only assume that when the Commission first makes a decision under its newly-revealed template it will fully elucidate it and its application. It may not simply invoke talismanically the fact that it is not the Equal Employment Opportunity Commission to reject out of hand a statistical showing that in analogous areas of the law would indicate "substantial under-representation"[77] and erect a prima facie case of intentional discrimination. Because it is not EEOC, the Commission may justifiably be guided by consideration other than those central to EEOC's responsibilities. But if the question is what demonstrates intentional discrimination without regard to the factors that go into deciding what to do about it the Commission cannot reasonably decide that statistics that have been accepted as Proving disparate treatment do not so much as raise a substantial Issue of such conduct in its eyes.
 
 III
 
 59
 My central concern in this opinion is the Commission's handling of the statistical attack by Chinese for Affirmative Action on Columbia Broadcasting System's employment of Asian-Americans at KCBS, its San Francisco AM station. An initial but easily surmountable objection to CAA's challenge is the Commission's apparent[78] position that it need not examine statistics reflecting job-treatment of Asian-Americans a minority group not "clearly the predominate minority in a licensee's SMSA."[79] To begin with, this unquestionably was a major and unexplained departure from past Commission policy. In 1974, for instance, the Commission decreed that "(t)he nondiscrimination provision applies to All persons, whether or not the individual is a member of a conventionally defined minority group,"[80] and many other manifestations of this view might be cited.[81]
 
 
 60
 Despite the court's approval today of this abrupt shift,[82] I see no reason whatever for countenancing purposeful discrimination merely because it is aimed at only one small group.[83] The Commission's antidiscrimination rules were promulgated in large part to assure that programming needs of minority groups in the licensees' audiences are met.[84] In other programming-related areas such as ascertainment, the Commission has not limited the licensee's responsibility to one of only serving "dominant" groups.[85] Even if a justification for a divergent view on job-bias were possible, the Commission has not yet expressed it, and an explanation by the Commission, not the court is necessary.[86] Since the Commission has articulated no rationale for ignoring the complaints of Asian-Americans merely because of the size of their group, I must proceed to the question whether the Commission properly can reject on the merits the statistical showing they proffered.
 
 
 61
 I am satisfied that CAA's figures, unless somehow successfully rebutted,[87] generated an inference of calculated employment discrimination. With 6.9%[88] of the Standard Metropolitan Statistical Area[89] labor force consisting of Asian-Americans, the expected number within the licensee's 249 employees during the license term was 17.[90] As a result of a preliminary Commission inquiry, we know that KCBS employed a total of ten, and perhaps only nine, Asian-Americans for various lengths of time during the license term under review.[91] Although this performance exceeds the 50-percent-of-parity range now proposed by the Commission, the unlikelihood that so great a disparity occurred solely by chance is only 3.67 percent or about one in 27 which is within the region normally considered significant.[92] This requires rejection of the null hypothesis that the licensee's hands are unquestionably clean. It does not conclusively prove intentional discrimination, of course, but it certainly does summon the Commission to ascertain whether, in light of all relevant information on hand or procurable through further inquiry the chances of an eventual finding of willful discrimination merit a hearing.
 
 
 62
 It was because Asian-Americans are not a dominant minority group in KCBS's service area that the Commission felt that an investigation into intentional discrimination was unwarranted.[93] The court shuns the ground administratively assigned for rejecting CAA's contentions and instead detects in the Commission's opinion a finding that CAA's statistical showing was examined but found wanting.[94] That opinion is hardly a model of precise analysis, but it is possible to discern four factors that the Commission could have deemed incompatible with an inference of purposeful discrimination against Asian-Americans had it thought itself bound to inquire into that subject. These are KCBS's in-term performance with respect to women and minorities overall, its affirmative action plan, its post-term performance with respect to Asian-Americans and the fact that it had employed some Asian-Americans during the term.[95]
 
 
 63
 Even assuming that the Commission actually did consider these factors to the end the court supposes, it never ventured any rationale for an implicit conclusion that they served to so dispel the inference of past purposeful discrimination naturally flowing from the statistical disparity demonstrated by CAA. And it is by now a basic tenet of administrative law that agency explication of the basis of its decision not only aids judicial review but also improves agency decisionmaking;[96] a corollary is that judicial review of agency action is not to be undertaken in the dark.[97] I would thus remand Chinese, as well as Bilingual II, so that the Commission can tell us just how it arrived at its decision. Because, however, the court does not do that, I think it necessary to protest the fallacies into which the Commission with the court's approval seems to be slipping. In doing so, I will treat the Commission's decision as if it had expressly relied upon the four factors mentioned by the court as counteractants to the inference of discrimination against Asian-Americans.
 
 
 64
 It is important to recall at the outset that the question is not whether a challenger has proven intentional discrimination but whether it has made a showing substantial enough to require further investigation on the Commission's part.[98] And as we have cautioned before, discrimination, even when consciously engaged in, is a very subtle process, and its attackers have "limited resources and no procedural tools" for rooting it out.[99] Primarily for those reasons, no one could seriously argue that indicia of discrimination, if in fact it has occurred, will always be readily available, or that absent direct evidence the propriety of employment practices must be presumed.[100] But the Commission often does seem to operate on a presumption to that effect,[101] as is exemplified by its oft-expressed distrust of challengers' statistics and its generally unquestioning acceptance of the protestations and statistical offerings of its licensees. A classic example of that is its treatment of the four factors that purportedly contradict the inference of deliberate bias in this case.
 
 
 65
 The Commission's misuse of statistical evidence is perhaps best shown by its conclusion that KCBS's statistics with regard to women and minorities overall somehow undercut the inference of intentional discrimination against Asian-Americans.[102] I need not consider whether evidence tending to show that a licensee does not discriminate against some minority groups is at all probative of whether he discriminated against another,[103] for these statistics while seemingly better than those of many other licensees still disclosed significant disparities, especially with respect to the more important positions at KCBS.[104] The figures are at best no indication of anything,[105] and I am unable to comprehend the Commission's half-stated position that statistics can be trusted to indicate an absence of intentional discrimination but not to indicate its presence.[106]
 
 
 66
 Similarly puzzling is the Commission's reliance on the fact that KCBS has an affirmative action plan. Four years ago we held that, when a licensee has voluntarily developed and energetically pursued a recruitment and placement program, the Commission may be justified in leaving uninvestigated a statistical disparity that otherwise would demand further inquiry.[107] Since the license term then under study, however, the Commission has imposed upon all licensees the duty of formulating quite extensive affirmative action plans,[108] and here the Commission simply noted that KCBS had such a program which apparently reflects no more than compliance with the Commission's rules.[109] A broadcaster's decision to abide by the requirement that he devise a plan is hardly conclusive proof that he has not intentionally discriminated in the past or is not planning to do so in the future; even hardcore racists are likely to comply superficially or grudgingly with Commission edicts once no alternative is in sight. The existence of an affirmative action program evidences good intentions only when on paper it is more than the rules demand or its implementation indicates a sincere desire to employ more minority-group workers, and not just to creep within the terms of the rules.
 
 
 67
 Only slightly less perplexing is the Commission's nearly complete dependence on KCBS's post-term statistics,[110] which the court accepts.[111] We have held that post-term statistics may be viewed, as obviously they must, in applying the acid test to the adequacy of a licensee's affirmative action program whether it has actually resulted in the hiring and promotion of members of the protected class.[112] But we have refused to consider post-term statistics in examining a contention of term-time intentional discrimination.[113] This position is bottomed on the well-established requirement that a licensee must run on his in-term record;[114] it is soundly based, too, on the rationales underlying the Commission's concern with willful discrimination, which as noted earlier do not support a policy of total prospectivity.[115] I need not discuss whether post-term statistics can more limitedly be referred to for example, to get a statistically-valid sample of a licensee's employment practices for here both the Commission and the court put controlling emphasis on the post-term figures.[116]
 
 
 68
 Lastly, we come to the circumstances that some Asian-Americans were employed by KCBS during the license term. The value of this evidence is seriously diminished as an initial matter by the stark fact that most did not remain for long.[117] On a more general level, it should suffice to say that tokenism and other attempts to hide discriminatory designs are no more commendable than overt prejudice. Racism and sexism assume many forms, and a complete bar to employment is but one of them. Statistically-significant underrepresentation can be the result of purposeful discrimination as much as can absolute exclusion.[118] For instance, race or sex may simply be one factor in an employment decision as for an employer who hires only exceptional black applicants[119] but the prohibited animus is still there.[120] Thus, while a total absence of minorities is damning in most situations, the employment of but a few is not a plus factor.[121] Their presence is taken into account in the initial statistical computation and should not be counted twice.[122]
 
 IV
 
 69
 To sum up, it seems to me that the Commission's performance in these two cases reflects its broad misapprehension of the value indeed, the logical compulsion of statistical evidence and of the methods by which statistical showings can be rebutted. That malaise has fatally infected the result in Chinese. It could be that the Commission ultimately should renew KCBS's license, but it has not yet satisfactorily explained why that should be so. The Commission cannot brush statistical challenges aside with flip rejoinders about the nature of its responsibilities. It is not the Equal Employment Opportunity Commission, and the Communications Act is not the Civil Rights Act, but evidence is evidence, and no less than other tribunals must the Commission give it due respect.
 
 
 70
 In both cases, the challengers' statistics indicated intentional discrimination, which the Commission admits is normally a compelling ground for denial of a license renewal. The Commission refused to consider the showing in Chinese, and even had it done so the fact remains that it has not elucidated what countervailing factors could and how they would overcome the evidentiary inference. And if they do outweigh the inference, it should be for the Commission, not the court, to explain how that is done. Accordingly, I concur in the court's disposition of Bilingual II, but respectfully dissent from the court's failure to reach the same outcome in Chinese.
 
 
 
 [1]
 We recently have considered this and related questions in Black Broadcasting Coalition of Richmond v. FCC, 181 U.S.App.D.C. 182, 556 F.2d 59 (1977); National Organization for Women (NOW) v. FCC, 181 U.S.App.D.C. 65, 555 F.2d 1002 (1977); Alianza Federal de Mercedes v. FCC, 176 U.S.App.D.C. 253, 539 F.2d 732 (1976); Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 505 F.2d 320 (1974); Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC ("Bilingual I"), 160 U.S.App.D.C. 390, 492 F.2d 656 (1974); and Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316 (1972). The instant cases, like the cases just cited, involve license renewal proceedings in which there was no other applicant for the license and where in consequence no comparative hearing was required. We express no views on the proper treatment to be accorded broadcasters' equal employment performance in situations where comparative hearings are required
 
 
 [2]
 CBS, Inc., 56 F.C.C.2d 296 (1975)
 
 
 [3]
 Mission Central Co., 54 F.C.C.2d 581, Reconsideration denied, 56 F.C.C.2d 782 (1975)
 
 
 [4]
 CAA is an organization concerned with employment opportunities for Chinese-Americans. BBC is an organization concerned with employment opportunities for Mexican-Americans. In Office of Communication of the United Church of Christ v. FCC ("Church of Christ I"), 138 U.S.App.D.C. 112, 359 F.2d 994 (1966), we directed that intervenors representing segments of a licensee's listening public be permitted to participate in license renewal proceedings. Since then, we have recognized the important role played by citizens groups in ensuring compliance with the statutory mandate that license renewals serve the public interest. Such groups must not "be treated as interlopers," Office of Communication of the United Church of Christ v. FCC ("Church of Christ II"), 138 U.S.App.D.C. 112, 115, 425 F.2d 543, 546 (1969) (Burger, J.), and must be afforded "a fair and reasonable opportunity . . . to seek explanations for (licensees') underemployment of minority groups," Bilingual I, 160 U.S.App.D.C. at 393, 492 F.2d at 659
 
 
 [5]
 Litigation between BBC and the FCC previously came before us in Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC ("Bilingual I"), 160 U.S.App.D.C. 390, 492 F.2d 656 (1974)
 
 
 [6]
 The procedures to be following in filing a petition to deny are set out at 47 U.S.C. § 309(d)(1) (1970)
 
 
 [7]
 The parties and the FCC have adopted or suggested various different bases for calculating the relevant "population" percentages. There is some question as to the correct geographical unit (whether the nine-county area served by KCBS, the five-county area comprising the SMSA, or the city of San Francisco itself); the correct population unit (whether the area workforce, or the area population as a whole); and the correct statistical result using given units (according to CBS, Asians comprise 6.2% Of the relevant SMSA population; according to CAA, 6.9%). More significantly, there is dispute as to which minority group or groups should be used as a basis of comparison (CBS and the FCC have adopted "all minority groups;" CAA has variously adopted "Asian-Americans" and "Chinese-Americans")
 Given the manipulability of statistics in inquiries of this sort, clear guidelines, we think, are essential. The FCC's position, as we understand it, is that the most relevant figure is usually the Overall percentage of Minorities in the SMSA workforce. See Rahall Broadcasting, Inc., 66 F.C.C.2d 295, 296 (1977); Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 60 F.C.C.2d 226, 242 (1976); 1972 License Renewal Applications for 28 Broadcast Facilities Licensed to the Philadelphia, Pa. Area, 53 F.C.C.2d 104, 113 (1975). Only "where one minority group predominates within the SMSA" is that group's percentage the focus of comparison. Mission Central Co., 56 F.C.C.2d 782, 784 (1975) (finding Mexican-Americans "dominant minority group" where they comprise 44% Of SMSA and 84% Of composite minority population in SMSA). Accord, KRMD, Inc., 53 F.C.C.2d 1179, 1186-87 (1975) (finding blacks "dominant" minority group where they comprise 33% Of SMSA and 99% Of composite minority population in SMSA). We believe that the FCC's position, with its statistical focus on overall minority population, is a reasonable one. Individual minority groups in most cases will comprise small percentages of the SMSA workforce; such small percentages generally will provide no meaningful basis for comparison with the workforces of most radio stations, which often employ only 25 to 75 workers.
 This does not mean, however, as the dissent suggests, that the FCC has limited "the coverage of its antidiscrimination rules to groups dominant in the licensee's service area," diss. op. at ---- of 193 U.S.App.D.C., at 636 of 595 F.2d, or that a station is free to discriminate against one minority group so long as it practices countervailing discrimination in favor of another. See id. at ---- of 193 U.S.App.D.C., at 651 of 595 F.2d. To read our opinion to countenance such discrimination would be wholly to misconstrue our views. The FCC has never wavered from its adherence to the principle that " '(t)he nondiscrimination provision applies to All persons . . . .' " Diss. op. at ---- of 193 U.S.App.D.C., at 647 of 595 F.2d, Quoting Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, 44 F.C.C.2d 735, 735-36 (1974). But there are many ways of proving discrimination, and percentage statistical comparisons, while often useful, are not always dispositive or even reliable. The Commission's position, as we see it, is simply that given its licensees' generally small workforces, inferences of discrimination from statistical disparities become weaker and less reliable as the percentage representation, of the individual minority group in the SMSA workforce, contracts. After checking to see that the percentage figures for All minorities and for the Largest individual minority group are acceptable, therefore, the FCC investigates discrimination against smaller groups by looking to other types of evidence. Evidence of actual discrimination in hiring, evidence of recruiting aimed selectively at one minority, and evidence that a particular group has had little or no representation on a station's payroll are clearly relevant, and should be examined to determine whether an employer is in fact discriminating against a "nondominant" minority, notwithstanding acceptable overall figures. Like the dissent, we "see no reason whatever for countenancing purposeful discrimination merely because it is aimed at only one small group," diss. op. at ---- of 193 U.S.App.D.C., at 647 of 595 F.2d, and we firmly believe that the FCC shares our conviction.
 This is not to say, of course, that the question of the proper use of statistics is free from difficulty. The question is difficult indeed. But it is a question which has not properly been raised by the parties to this appeal; a question whose resolution is not necessary to dispose of these cases; and a question which is best left to administrative rather than judicial investigation in the first instance. See note 42 Infra.
 
 
 [8]
 FCC Form 395, Adopted in Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 23 F.C.C.2d 430, 436-42 (1970). The FCC recently released Notice of a Proposed Rulemaking to consider amendments to Form 395. See p. ---- of 193 U.S.App.D.C., at p. 635 of 595 F.2d & note 59 Infra
 
 
 [9]
 Six of the Asian employees were not employed during the particular payroll periods from which the 395 Form data were drawn. Two of the Asian employees were omitted because a computerized payroll system used to generate 395 Form data did not include them. One of the Asian employees (a Filipino) was listed on the Forms as "Spanish-surnamed" rather than "Asian."
 
 
 [10]
 The ninth Asian was included in the annual reports, but was listed as "Spanish-surnamed." See note 9 Supra
 
 
 [11]
 Of the eight Asians not listed in the annual reports, one was still employed; one had joined a training program at a local television station; one had accepted a fellowship at the Washington Journalism Center; one had taken a news position at another station; and one had been discharged and had filed discrimination complaints with state and federal agencies. No reasons for the departure of the remaining three Asian employees were given. This information had not been requested by the FCC, but was supplied voluntarily
 
 
 [12]
 In the San Francisco-Oakland, SMSA, the five largest minority groups comprise 25.8% Of the workforce; women comprise 38.4%. Of KCBS' full-time employees in 1975, 23.8% Belonged to minority groups and 29.8% Were women. 56 F.C.C.2d at 302 & n.12
 
 
 [13]
 Fourteen minority employees (eight men and six women) held positions in the top four job categories; the remaining six minority employees held office and clerical jobs. On average, over 60% Of Asian employees held professional positions. See 56 F.C.C.2d at 302
 
 
 [14]
 Id. (footnotes omitted)
 
 
 [15]
 We have consistently held that employment and population percentages need not necessarily be in parity; it is sufficient if the licensee's minority employment figures, considered under all the facts of the case, fall within a "zone of reasonableness". Stone, 151 U.S.App.D.C. at 161, 466 F.2d at 332. See Black Broadcasting, 181 U.S.App.D.C. at 184-185, 556 F.2d at 61-62; NOW, 181 U.S.App.D.C. at 78, 555 F.2d at 1015; Alianza, 176 U.S.App.D.C. at 261, 539 F.2d at 740; Columbus Broadcasting, 164 U.S.App.D.C. at 222, 505 F.2d at 329; Bilingual I, 160 U.S.App.D.C. at 393, 492 F.2d at 659 & n.11. See notes 16 & 33 Infra
 
 
 [16]
 The FCC noted that KONO's employment profiles were similar to those of San Antonio licensees which had been found to be within the zone of reasonableness In 1972. The Commission stated, however, that "(t)he zone of reasonableness is a dynamic concept, which contracts as licensees are given time in which to implement (FCC) antidiscrimination rules and policy." 54 F.C.C.2d at 586. See 56 F.C.C.2d at 784-85. In Bilingual I, we intimated that the zone of reasonableness could be expected to contract over time. See 160 U.S.App.D.C. at 393, 492 F.2d at 659. In NOW, we approved the FCC's use of the "contracting zone" concept. See 181 U.S.App.D.C. at 71, 555 F.2d at 1018 & n.108
 
 
 [17]
 54 F.C.C.2d at 587
 
 
 [18]
 KONO requested reconsideration of the conditional renewal, contending Inter alia that no administrative sanction was warranted in view of its 45-year history of minority employment. Although the FCC rejected the petition, it said that KONO's history of minority employment "was a consideration in (its) determination to condition the license renewal, rather than take more stringent action, i. e., renewal of the license for a short term or designation of the application for a hearing on employment issues." 56 F.C.C.2d at 786
 
 
 [19]
 Appeal lies under 47 U.S.C. § 402(b)(6) (1970)
 
 
 [20]
 47 U.S.C. § 309(a) (1970)
 
 
 [21]
 Petition for Rulemaking To Require Broadcast Licensees To Show Nondiscrimination in Their Employment Practices, 18 F.C.C.2d 240, 241-42 (1969); Petition for Rulemaking To Require Broadcast Licensees To Show Nondiscrimination in Their Employment Practices, 13 F.C.C.2d 766, 769 (1968)
 
 
 [22]
 NAACP v. FPC, 425 U.S. 662, 669, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). Cf. id. at 670, 96 S.Ct. at 1812:
 The use of the words "public interest" in the Gas and Power Acts is not a directive to the Commission to seek to eradicate discrimination, but, rather, is a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates.
 (footnote omitted).
 
 
 [23]
 NOW, 181 U.S.App.D.C. at 70, 555 F.2d at 1017, Quoting NAACP v. FPC, 425 U.S. 662, 670 n.7, 96 S.Ct. 1806, 1812, 48 L.Ed.2d 284 (1976) (emphasis and footnotes omitted)
 
 
 [24]
 See NOW, 181 U.S.App.D.C. at 70, 555 F.2d at 1017, Quoting National Broadcasting Co., 58 F.C.C.2d 419, 422 (1976): "(The FCC's approach) is prospective, seeking to lead a licensee who has not possessed an adequate affirmative action program in the past to adopt policies ensuring an active recruitment program and genuine equal employment opportunity in the future."
 
 
 [25]
 See NOW, 181 U.S.App.D.C. at 82, 555 F.2d at 1019 & nn.113-14 (citing cases)
 
 
 [26]
 See Supplemental Memorandum of FCC (31 Oct. 1977) at 5-6
 
 
 [27]
 47 U.S.C. § 309(d)(2) (1970)
 
 
 [28]
 Church of Christ I, 123 U.S.App.D.C. at 341, 359 F.2d at 1007. See NOW, 181 U.S.App.D.C. at 68, 555 F.2d at 1005; Alianza, 176 U.S.App.D.C. at 257, 539 F.2d at 736; Columbus Broadcasting, 164 U.S.App.D.C. at 215, 505 F.2d at 322
 
 
 [29]
 Alianza, 176 U.S.App.D.C. at 257, 539 F.2d at 736
 
 
 [30]
 S.Rep.No.690, 86th Cong., 1st Sess. 3 (1959), Quoted in Stone, 151 U.S.App.D.C. at 151, 466 F.2d at 322
 
 
 [31]
 See Black Broadcasting, 181 U.S.App.D.C. 184-185, 188, 556 F.2d at 61-62, 64 (hearing required where allegations of overt discrimination are responsibly made and minority employment is outside zone of reasonableness); Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 54 F.C.C.2d 354, 361 (1975); 1972 License Renewal Applications for 28 Broadcast Facilities Licensed to the Philadelphia, Pa. Area, 53 F.C.C.2d 104, 113 n.11 (1975); Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 13 F.C.C.2d 766, 770 (1968)
 
 
 [32]
 See NOW, 181 U.S.App.D.C. at 81, 555 F.2d at 1018; Alianza, 176 U.S.App.D.C. at 261, 539 F.2d at 740; Columbus Broadcasting, 164 U.S.App.D.C. at 222, 505 F.2d at 329; Bilingual I, 160 U.S.App.D.C. at 392, 492 F.2d at 658-59; Stone, 151 U.S.App.D.C. at 158-159, 160, 466 F.2d at 329-30, 332. Cf. Black Broadcasting, 181 U.S.App.D.C. at 85, 87, 556 F.2d at 62, 64 (hearing required where substantial statistical disparity accompanied by responsible allegations of overt discrimination and serious questions as to adequacy of affirmative action plan). In Stone and Bilingual I, we suggested in dictum that statistical evidence of an Extremely low rate of minority employment could constitute a Prima facie showing of employment discrimination. See 151 U.S.App.D.C. at 161, 466 F.2d at 332, 160 U.S.App.D.C. at 392, 492 F.2d at 658
 
 
 [33]
 The FCC has adopted a rule of thumb that a station's "overall minority and/or female employment" is within the zone of reasonableness if it "reflects at least 50 percent of (those groups') respective percentages in the relevant work force and 25 percent of such percentages in the station's upper-four jobs." Letter of FCC Secretary Vincent J. Mullins to George A. Fisher, Clerk, U.S. Court of Appeals for the D.C. Circuit (16 Sept. 1977) at 1. This Court in the past has found more substantial disparities "reasonable," see note 41 Infra, and the FCC's own rule previously was less stringent. See Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 54 F.C.C.2d 354 (1975). Considered in a vacuum, of course, naked statistical comparisons are meaningless; the statistical disparities allowable under a zone of reasonableness necessarily will contract over time, see NOW, 181 U.S.App.D.C. at 81, 555 F.2d at 1018-19 and note 16 Supra, and "a disparity that is reasonable in light of a recruitment policy might not be reasonable in its absence." Bilingual I, 160 U.S.App.D.C. at 392, 492 F.2d at 658
 
 
 [34]
 A license renewal hearing, where (as here) there is no other applicant for the license, can be an unnecessarily costly and time-consuming procedure, and the Congressional purpose is to avoid such hearings whenever possible. See Stone, 151 U.S.App.D.C. at 151, 466 F.2d at 322 & n.14; Southwestern Operating Co. v. FCC, 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 & n.2 (1965); Letter of FCC Secretary Vincent J. Mullins, Supra note 33 at 12. When the FCC concludes from the initial pleadings that a factual uncertainty prevents summary renewal of a license, therefore, it generally attempts to resolve the factual uncertainty by requesting further information, rather than by designating the application for an immediate renewal hearing. See id. at 2-5, 8, 12; Supplemental Memorandum of FCC at 7. The Communications Act permits this course. Section 309(d)(2) and (e) of the Act require the FCC to designate an application for a hearing "(i)f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with (the public interest, convenience, and necessity)." 47 U.S.C. § 309(d)(2) (1970). Yet this section does not require that the FCC make the necessary findings on the basis of the Initial pleadings in the license renewal proceeding; it states that the Commission shall make its findings "on the basis of the application, the pleadings filed, or other matters which it may officially notice." Id. The Act expressly permits the FCC to request further information from the licensee. See note 36 Infra. The facts thus generated become part of the licensee's renewal application or are facts that the FCC may notice officially
 
 
 [35]
 Bilingual I, 160 U.S.App.D.C. at 393, 492 F.2d at 659
 
 
 [36]
 Id. (emphasis original). The Communications Act expressly permits the FCC to conduct further inquiry if it believes that more information is necessary before it can dispose of a license renewal application. See 47 U.S.C. § 308(b) (1970):
 The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked.
 See NOW, 181 U.S.App.D.C. at 71, 555 F.2d at 1018 ("If the Commission here . . . had not itself sought out more detailed data (regarding the station's) hiring and promoting(,) it may have been under some obligation to NOW to afford it some discovery . . . so that the effectiveness of (the station's) EEO plan could be fairly assessed.") (footnote omitted).
 
 
 [37]
 Factual uncertainties led the FCC to request more detailed employment information from broadcasters in the instant Chinese case, see p. ---- of 193 U.S.App.D.C., p. 1626 of 595 F.2d Supra, and in NOW, 181 U.S.App.D.C. at 69, 71, see 555 F.2d at 1016, 1018. Because the FCC is prepared to conduct its own inquiry when necessary, it has denied petitioners' requests for prehearing discovery. E. g., Avco Broadcasting Corp., 53 F.C.C.2d 48, 57-59 (1975). At present, the Commission's rules provide for discovery only after a license renewal application has been designated for a hearing. 47 C.F.R. § 1.311 (1976). A recent FCC order declining to amend these rules so as to provide for prehearing discovery, see Citizens Communications Center, 61 F.C.C.2d 1112, 1125-27 (1976), was not challenged
 
 
 [38]
 See NOW, 181 U.S.App.D.C. at 71, 555 F.2d at 1018 n.103
 
 
 [39]
 Stone, 151 U.S.App.D.C. at 151, 466 F.2d at 322, Quoting West Mich. Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 40, 396 F.2d 688, 691 (1968)
 
 
 [40]
 Columbus Broadcasting, 164 U.S.App.D.C. at 217, 505 F.2d at 324, Quoted in NOW, 181 U.S.App.D.C. at 68, 555 F.2d at 1005. Accord, Alianza, 176 U.S.App.D.C. at 257, 539 F.2d at 736
 
 
 [41]
 As noted above, the FCC has adopted a rule of thumb that a station's percentage of minority employees is within the zone of reasonableness if it exceeds 50% Of parity with the percentage of minority persons in the relevant workforce. See note 33 Supra. KCBS' overall minority employment was at 92% Of parity in 1975. See note 12, Supra. KCBS' Asian employment was at 98% Of parity in 1974 and at 56% Of parity in 1975. See pp. ---- & ---- of 193 U.S.App.D.C., pp. 625 & 626 of 595 F.2d Supra. In Stone, we found a station's black employment to be within the zone of reasonableness when it was at 29% Of parity. See 151 U.S.App.D.C. at 161, 466 F.2d at 332. In Bilingual I, we found a station's Mexican-American employment to be within the zone of reasonableness when it was at 25% Of parity. See 160 U.S.App.D.C. at 495, 492 F.2d at 659 & n.11
 
 
 [42]
 56 F.C.C.2d at 302 & n.13. We reject the dissent's view that the FCC's decision manifests a "nearly complete dependence on KCBS's post-term statistics, which the court accepts." Diss. op. at ---- of 193 U.S.App.D.C., at 652 of 595 F.2d (footnotes omitted). Although post-term statistics may be of some relevance under the Commission's prospective approach, see p. ---- of 193 U.S.App.D.C., p. 628 of 595 F.2d Supra, we have never accepted, and we do not here accept, the proposition that license renewals may be granted in reliance on post-term statistics alone. To permit exclusive reliance on such statistics would be to allow licensees to discriminate throughout the term, confident that they could secure renewal by hiring minority workers After the term had expired. We would not permit this; we trust the FCC would not permit it either. But Chinese is not such a case. As Judge Robinson himself recognizes, the Commission examined statistics on the Number of Asian-American (specifically Chinese and Japanese) employees during the term, and based its renewal decision not only on a favorable statistical review, but also on the absence of any allegations of overt discrimination and on the effectiveness of the station's affirmative action plan
 The dissent contends that the FCC would have found KCBS's statistical showing inadequate if it had cast the figures in terms of "person/months," rather than examining the number of Asian employees or their 1974 percentage of KCBS' workforce. As counsel for petitioner conceded at oral argument, however, the FCC has never used (or, as far as we know, ever been asked to use) a "person/month" method of calculation. Judge Robinson suggests that this method has the advantage of "factor(ing) in the length of the employees' stay, the shortness of which might be due to intentional discrimination." Diss. op. at ---- of 193 U.S.App.D.C., n.92, at 649 of 595 F.2d n.92. Yet as such the "person/month" mode of calculation is but a sophisticated version of the "revolving door" argument which, as the dissent concedes, Id. at ---- - ---- of 193 U.S.App.D.C. n.117, at 653 of 595 F.2d n.117, CAA was obliged to present to the Commission. See pp. --------- of 193 U.S.App.D.C., pp. 632-633 of 595 F.2d Infra. It might be wise for the FCC to adopt "person/month" analysis, but this is precisely the type of argument which Congress has instructed petitioners to present in the first instance to the Commission and not to us.
 
 
 [43]
 Of the eight Asians not included in KCBS' employment reports, p. ---- of 193 U.S.App.D.C., p. 626 of 595 F.2d Supra, seven had left the station by October 1975; four had remained at KCBS for only three months
 
 
 [44]
 CAA also contends that the KCBS' Asian employees were confined to lower job categories. This contention, made for the first time at oral argument, is frivolous. See note 13 Supra
 
 
 [45]
 Because the "revolving door" allegation was not made until the eleventh hour, the discovery that CAA has sought throughout this litigation bears no relation to the question about which it now says discovery was required. CAA's 98-question "Employment Questionnaire" did not address the "revolving door" problem, but dealt exclusively with KCBS' affirmative action program
 
 
 [46]
 Church of Christ I, 123 U.S.App.D.C. at 340, 359 F.2d at 1006
 
 
 [47]
 47 U.S.C. § 405 (1970). See Alianza, 176 U.S.App.D.C. at 260, 539 F.2d at 739:
 Raising (an) argument for the first time before this court . . . does violence . . . to the scheme of agency-court partnership contemplated by the Communications Act. The Commission must be given a fair opportunity to pass on a novel legal or factual argument, either initially or on a petition for reconsideration, before it can be brought before a reviewing court. Otherwise, the reviewing court would in effect be exercising primary jurisdiction over any issue not raised in front of the agency.
 (footnotes omitted).
 
 
 [48]
 CAA filed this appeal on 5 December 1975, three days before the expiration of the period in which to petition for reconsideration. At oral argument, CAA endeavored to excuse its precipitousness by arguing that petitioning for reconsideration would have been "futile." Whatever the worth of a "futility" argument in general, see Office of Communication of the United Church of Christ v. FCC, 150 U.S.App.D.C. 339, 343-44, 465 F.2d 519, 523-24 & n.17 (1972), it is uncompelling here "in the absence of any concrete indication that reconsideration would have been futile." Action for Children's Television v. FCC, 183 U.S.App.D.C. 437, 448, 564 F.2d 458, 469 (1977)
 
 
 [49]
 The FCC apparently believed that KONO's unzealous prosecution of its affirmative action plan wholly accounted for these employment disparities and that a prospective remedy was therefore proper. See 56 F.C.C.2d at 786-87. The FCC's conclusion rests on the assumption that unzealous prosecution of an affirmative action plan can never constitute evidence of intentional discrimination sufficient to require a renewal hearing. We have never decided the validity of this assumption, and we do not need to decide it here, for in this case there was absolutely no evidence to support the FCC's belief. On the facts before it, the Commission could but speculate as to whether the disparities owed to intentional discrimination, unintentional discrimination, or chance. Judging from the apparent success of FCC monitoring in this case, one might argue with the benefit of hindsight that the Commission's speculations were correct: the percentage of Mexican-Americans in KONO's workforce increased to 26% In 1976 and 32% In 1977. See Letter of FCC Secretary Vincent J. Mullins, Supra note 33, at 10 n.4. Yet even ignoring the fact that KONO's enhanced EEO efforts were carried out "under the gun," post-term improvements do not necessarily dispose of allegations that a station engaged in intentional discrimination During the license term. This was the question the FCC neglected to investigate; what weight the FCC should accord KONO's post-term improvements in answering this question on remand is a matter we leave to the Commission's sound discretion
 
 
 [50]
 Our disposition of this case is not inconsistent with our disposition of Black Broadcasting. In Black Broadcasting, there were responsible, contested claims of overt discrimination, as well as minority employment outside the zone of reasonableness and an ineffective affirmative action plan. 181 U.S.App.D.C. at 184, 186, 556 F.2d at 62, 64. Under these circumstances, we concluded that a substantial and material question concerning the licensee's character qualifications had been established, and ordered that the application be designated for a renewal hearing. Id. at 186, 187, 556 F.2d at 64, 65. In Bilingual II, minority employment is only slightly outside the zone of reasonableness and there are no allegations of overt discrimination. Under these circumstances, we conclude that at most a possible inference of employment discrimination has been established, and that this factual uncertainty may be capable of resolution by methods short of a full-scale renewal hearing, E. g., by further FCC investigation. See note 34 Supra
 
 
 [51]
 See p. ---- of 193 U.S.App.D.C., p. 630 of 595 F.2d Supra
 
 
 [52]
 See, e. g., FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15 (1952) ("(T)he guiding principle . . . is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration."); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940) ("(The) differences in origin and function (between courts and administrative agencies) preclude wholesale transplantation of the rules of procedure . . . which have evolved from the history and experience of courts. . . . (Agencies) should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (footnote omitted)
 
 
 [53]
 See p. ---- of 193 U.S.App.D.C., p. 630 of 595 F.2d & note 37 Supra
 
 
 [54]
 See FCC News, 12 May 1977
 
 
 [55]
 See Citizens Communications Center, 61 F.C.C.2d 1112, 1126-27 (1976):
 (W)e do not believe that firm control could be effectively exercised over the numerous requests that would in all probability be received if our discovery rules were expanded to the extent suggested by petitioner. Each year the Commission receives a substantial number of petitions or complaints against broadcast licensees. Although we would not anticipate that every petitioner or complainant would request discovery, it seems clear to us that if a substantial number did so it would require an inordinate amount of time and effort to determine whether the requests would properly lie for the production of such records.
 
 
 [56]
 The FCC may revoke a station's license for false statements knowingly made in connection with applications for licenses, or modifications or renewals thereof. 47 U.S.C. § 312(a)(1) (1970). See FCC v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 91 L.Ed. 204 (1946)
 
 
 [57]
 Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 133, 351 F.2d 824, 830 (1965)
 
 
 [58]
 Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 60 F.C.C.2d 226, 249-52 (1976). We commented hopefully on this FCC initiative in NOW. See 181 U.S.App.D.C. at 78 & n.88, 81 n.103, 555 F.2d at 1015 & n.88, 1018 n.103
 
 
 [59]
 Petitions for Rulemaking to Amend FCC Form 395 and Instructions, 66 F.C.C.2d 955 (1977). In this Notice the FCC aired various proposals for making the job categories listed on the 395 Form reflect more realistically the structure of the broadcast industry, and for requesting information about pay levels within job categories. The Commission also invited comments on "the possible inclusion of additional information which could be relevant to (the Commission's EEO program) and the means by which such information could be solicited." Id. at 959. Examples of additional information that might be considered for inclusion are the names and addresses of individual minority employees, and the types of jobs they hold. If petitioners to deny had access to this information, they could investigate possible charges of overt discrimination without disturbing employees on the job. Divulgence of such information, of course, might run afoul of the Privacy Act, and its inclusion in any event is within the ultimate discretion of the Commission
 
 
 [60]
 160 U.S.App.D.C. at 393, 492 F.2d at 659
 
 
 [1]
 Majority Opinion (Maj. Op.) text at notes 34-38
 
 
 [2]
 Id., 193 U.S.App.D.C. at ----, 595 F.2d at 634
 
 
 [3]
 I concur in the court's refusal to require predesignation discovery as a general matter. Maj. Op. text at notes 51-52; see FCC v. Schreiber, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467-1468, 14 L.Ed.2d 383, 391-392 (1965) ("(t)o permit federal district courts to establish administrative procedures de novo would, of course, render nugatory Congress' effort to insure that administrative procedures be designed by those most familiar with the regulatory problems involved")
 
 
 [4]
 Maj.Op., 193 U.S.App.D.C. at ----, 595 F.2d at 634
 
 
 [5]
 Id., 193 U.S.App.D.C. at ----, 595 F.2d at 624
 
 
 [6]
 No. 75-1855
 
 
 [7]
 No. 75-2181
 
 
 [8]
 E. g., NOW v. FCC, 181 U.S.App.D.C. 65, 78, 555 F.2d 1002, 1015 (1977); Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees (Nondiscrimination 1976), 60 F.C.C.2d 226, 227-228 (1976); United States Commission on Civil Rights, Window Dressing on the Set: Women and Minorities in Television 131-132 (1977)
 
 
 [9]
 Petition for Rulemaking to Require Licensees to Show Nondiscrimination in Their Employment Practices (Nondiscrimination 1968), 13 F.C.C.2d 766 (1968)
 
 
 [10]
 See Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices (Nondiscrimination 1970), 23 F.C.C.2d 430, 431 (1970)
 
 
 [11]
 Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 771. As the Commission elucidated, "a petition or complaint raising substantial issues of fact concerning discrimination in employment practices calls for Full exploration by the Commission Before the grant of the broadcast application. . . ." Id. (emphasis supplied)
 
 
 [12]
 See, E. g., Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees (Nondiscrimination 1975), 54 F.C.C.2d 354, 361 (1975) ("(w)here it appears that the broadcaster has followed discriminatory employment practices, we will not hesitate to order a hearing to resolve any substantial and material questions of fact relating to the broadcaster's employment policies and practices")
 
 
 [13]
 Maj.Op., 193 U.S.App.D.C. at ----, 595 F.2d at 629
 
 
 [14]
 By "disparate treatment" I mean not only consciously plotted acts that result from racial animus, but also conduct arising from the thoughtlessness of stereotypes and irrational generalizations. Both conscious purpose and subconscious purpose neglect can fall within this category, for behind today's failure to think of minority interests is yesterday's deliberate decision to discriminate. As Justice Stevens has explained:
 Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white.
 Mathews v. Lucas, 427 U.S. 495, 520, 96 S.Ct. 2755, 2769, 49 L.Ed.2d 651, 669 (1976) (Stevens, J., with Brennan & Marshall, JJ., dissenting). It makes little difference whether a licensee purposely calculated that an applicant was unable to handle the responsibilities of a position because of his race or whether the licensee's socialization was so imbued with the stereotype that it simply never occurred to him that the applicant could do the job. Improper purpose and neglect have the very same impact on the policies that the Commission's job-bias rules seek to further. As has been said in another context, "the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967), Aff'd as modified sub nom. Smuck v. Hansen, 132 U.S.App.D.C. 372, 408 F.2d 175 (En banc 1969). So although I will use such words as "intentional" and "purposeful," I am not ruling our inconsiderateness born of prejudice.
 
 
 [15]
 NAACP v. FPC, 425 U.S. 662, 670, 96 S.Ct. 1806, 1812, 48 L.Ed.2d 284, 292 (1976)
 
 
 [16]
 Id. at 670 n.7, 96 S.Ct. at 1812 n.7, 48 L.Ed.2d at 292 n.7
 
 
 [17]
 Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 770; accord, Nondiscrimination 1976, supra note 8, 23 F.C.C.2d at 229; see NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 80, 555 F.2d at 1017, quoting NAACP v. FPC, supra note 15, 425 U.S. at 670-671 n.7, 96 S.Ct. at 1812 n.7, 48 L.Ed.2d at 292 n.7
 
 
 [18]
 See Black Broadcasting Coalition v. FCC, 181 U.S.App.D.C. 182, 187 n.21, 556 F.2d 59, 64 n.21 (1977), citing NAACP v. FPC, supra note 15, 425 U.S. at 670-671 n.7, 96 S.Ct. at 1812 n.7, 48 L.Ed.2d at 292 n.7. See also TV 9, Inc. v. FCC, 161 U.S.App.D.C. 349, 358, 495 F.2d 929, 938 (1973), Cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974) (Commission must give weight to minority ownership and participation in comparative-application proceeding as a portent of increased diversity of program content); Garrett v. FCC, 168 U.S.App.D.C. 266, 273, 513 F.2d 1056, 1063 (1975) ("(t)he entire thrust of TV 9 is that black ownership and participation together are themselves likely to bring about programming that is responsive to the needs of the black citizenry")
 
 
 [19]
 NAACP v. FPC, 172 U.S.App.D.C. 32, 42, 520 F.2d 432, 442 (1975), Aff'd, NAACP v. FPC, supra note 15 ("(t)he (Commission) has reached the conclusion that a broadcaster's programming will Inevitably fail fairly to reflect the tastes and viewpoints of minorities if those minorities are systematically excluded from the broadcaster's employ" (emphasis supplied))
 
 
 [20]
 Both the Commission and this court have recoiled from direct examination of licensees' programming decisions. See, E. g., NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 73, 555 F.2d at 1010
 
 
 [21]
 NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 80, 555 F.2d at 1017, citing Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 769
 
 
 [22]
 Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 769; see FCC v. American Broadcasting Co., 347 U.S. 284, 289 n.7, 74 S.Ct. 593, 597 n.7, 98 L.Ed. 699, 705 n.7 (1954)
 
 
 [23]
 Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices (Nondiscrimination 1969), 18 F.C.C.2d 240, 241 (1969); see Comment, EEOC Regulatory Intervention: An Undeveloped Means of Enforcing Title VII, 62 Geo.L.J. 1753, 1763-1764 (1974) ("(t)o avoid placing their imprimatur on discrimination, regulatory agencies must ascertain that regulatees do not engage in unlawful practices before awarding them benefits"). Compare NAACP v. FPC, supra note 15
 
 
 [24]
 Maj.Op. text at note 21, citing Nondiscrimination 1969, supra note 23, 18 F.C.C.2d at 241-242 and Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 769; Cf. Black Broadcasting Coalition v. FCC, supra note 18, 181 U.S.App.D.C. at 187 n.21, 556 F.2d at 64 n.21
 
 
 [25]
 Maj.Op., 193 U.S.App.D.C. at ----, 595 F.2d at 628; see 47 C.F.R. §§ 73.125(b), 73.599(b), 73.680(b), 73,793(b) (1976); Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 230; Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, 44 F.C.C.2d 735, 735-736 (1974)
 
 
 [26]
 Nondiscrimination 1976, supra note 8
 
 
 [27]
 FCC Responses to Questions Posed by Court in D.C. Cir. Nos. 75-1855 & 75-2181, at 7 (Sept. 16, 1977); see National Broadcasting Co. (1972 WRC Renewal), 58 F.C.C.2d 419, 422 (1976)
 
 
 [28]
 The affirmative-action requirement, unlike the prohibition on intentional discrimination, is concerned with future results, not the present character of the licensee it is an effort to lead broadcasters to better performance. See Maj.Op. text at notes 24-26. Character defects, on the other hand, are more subtle and permanent than mere numbers, and it is obviously more difficult to determine whether a correction in character has actually been made. For that very reason, the Commission has adamantly refused to give a "second bite at the apple" to licensees whose character infirmities surfaced in acts of deceit. See Grenco, Inc., 39 F.C.C.2d 732, 737 (1973). Thus the Commission will resort to prospective orientation for example, in the form of a short-term renewal only if the misrepresentation was seemingly inadvertent. See Id.; Bluegrass Broadcasting Co., 43 F.C.C.2d 990, 993-994 (1973)
 
 
 [29]
 Supplemental Memorandum of Appellee FCC in No. 75-2181, at 6 n.4; United States Commission on Civil Rights, Supra note 8, at 135; see CBS, Inc. (1974 KCBS Renewal), 56 F.C.C.2d 296, 302 (1975) (referring to the "licensee's current performance in hiring and promotion")
 The question whether the Commission could properly determine Never to impose the sanction of renewal denial for Unintentional disparities and failures to comply with the affirmative action rules is not before us today. See note 12 Supra. The statistical presentation in this case is sufficient, in the absence of reasoned explication to the contrary by the Commission, to give rise to an inference of purposeful bias. See note 92 Infra.
 
 
 [30]
 See Maj.Op., 193 U.S.App.D.C. at -----, 595 F.2d at 628-629
 
 
 [31]
 As has been posited, "ownership is the most significant factor influencing the content of media." Case Note, 43 U.Cin.L.Rev. 669, 677 (1974). See also note 18 Supra
 
 
 [32]
 We are not called upon by this case to determine whether the underlying objectives are forsaken by the prospective orientation reflected in a Commission decision to take a chance on a licensee who had admitted his past misdeeds and apparently is prepared to make a sincere effort to reform. Compare Office of Communication of United Church of Christ v. FCC (UCC I), 123 U.S.App.D.C. 328, 342 & n.28, 359 F.2d 994, 1008 & n.28 (1966) with note 28 Supra
 
 
 [33]
 E. g., Continental Air Lines, Inc. v. CAB, 179 U.S.App.D.C. 334, 344, 551 F.2d 1293, 1303 (1977) ("(r)easoned decisionmaking requires an agency to explain changes of policy from past decisions")
 
 
 [34]
 Supra note 8
 
 
 [35]
 181 U.S.App.D.C. at 81-82, 555 F.2d at 1018-1019. As a panel, we were bound in NOW by the "zone of reasonableness" concept, the contours of which had been established by our earlier decisions. See notes 66-68 Infra and accompanying text. We are now sitting En banc and thus are free to constrict the zone to parallel an evolving understanding of statistical proof vis-a-vis the concerns that eventuated in the Commission's antidiscrimination endeavors. See notes 76-77, 92 Infra and accompanying text
 
 
 [36]
 See 181 U.S.App.D.C. at 82-83, 555 F.2d at 1019-1020
 
 
 [37]
 See Maj.Op., 193 U.S.App.D.C. at ----, 595 F.2d at 628-629
 
 
 [38]
 See notes 11-13 Supra and accompanying text
 
 
 [39]
 See notes 11 & 13 Supra and accompanying text
 
 
 [40]
 The court indicates that challengers have no Right to Commission assistance in checking the veracity of facts represented by licensees. Maj.Op., 193 U.S.App.D.C. at ---------, 595 F.2d at 634-635. I do not take this as absolving the Commission of the responsibility of making such inquiry itself when the circumstances necessitate. Nor do I take it as indicating that a challenger's presentation can be outweighed solely by a licensee's sworn, conclusory denial of intentional discrimination
 
 
 [41]
 Communications Act of 1934, tit. III, § 309, 48 Stat. 1085, As amended, 47 U.S.C. § 309(d) (1970). See generally Stone v. FCC, 151 U.S.App.D.C. 145, 150-151, 466 F.2d 316, 321-323 (1972). The Commission's function under § 309(d) is not the same as that of a court faced with a motion either for dismissal or summary judgment. The Commission is neither prohibited from looking to countervailing evidence nor compelled to draw every reasonable inference in favor of the challenger. Thus the Commission is not required to hold a hearing merely on the basis of an unsupported allegation of intentional discrimination, see Folkways Broadcasting Co. v. FCC, 126 U.S.App.D.C. 123, 127, 375 F.2d 299, 303 (1967), or on some slight evidence giving rise to no more than a weak inference in that regard. See Columbia Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 218, 505 F.2d 320, 325 (1974). The allegation must not only be material and genuinely in dispute, but must create a substantial issue. On the other hand, however, allegations not rising to the level of those necessitating a hearing might still be sufficient to preclude the Commission from making the essential finding that renewal is in the public interest without first engaging in an inquiry less demanding than a hearing. And, indeed, even if no "substantial and material question of fact is presented" by any challenger, the Commission is required to hold a hearing if "for any reason" it cannot "make the requisite finding that the public interest would be served." Citizens Comm. to Save WEFM v. FCC, 165 U.S.App.D.C. 185, 198, 506 F.2d 246, 259 (En banc 1974)
 
 
 [42]
 Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 771-772
 
 
 [43]
 Nondiscrimination 1969, supra note 23, 18 F.C.C.2d at 243, quoting Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), Aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962) (footnote omitted); accord, Nondiscrimination 1970, supra note 19, 23 F.C.C.2d at 432 ("(s)tatistics may not give definitive answers, but they clearly can raise valid questions"); Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, supra note 25, 44 F.C.C.2d at 736 (statistics showing "highly disproportionate representation . . . may constitute evidence of discriminatory practices"); Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 229; see Id. at 236 ("(o)ur past experience leads us to believe that . . . statistics of available minorities and women represents (Sic ) an acceptable means of measuring a licensee's EEO performance"). Proper statistics involving other material issues can meet the requirements of Section 309(d) and thus necessitate a hearing. See WLVA, Inc. v. FCC, 148 U.S.App.D.C. 262, 273-274, 459 F.2d 1286, 1297-1299 (1972)
 
 
 [44]
 Teleprompter of Worcester, Inc., 42 Rad.Reg.2d (P&F) 287, 302 (1978)
 
 
 [45]
 E. g., Teamsters Int'l v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 418 (1977), citing Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630, 644 (1974) ("(s)tatistics are equally competent in proving employment discrimination"); Kinsey v. First Regional Sec., Inc., 181 U.S.App.D.C. 207, 216, 557 F.2d 830, 839 (1977) ("statistical disparity between the proportion of blacks in the employer's work force and the proportion of blacks in the relevant labor market constitutes a prima facie case of discrimination")
 
 
 [46]
 Copus, The Numbers Game Is the Only Game in Town, 20 How.L.J. 374, 380-381 (1977)
 
 
 [47]
 United States v. Ironworkers Local 86, 443 F.2d 544, 551 (9th Cir.), Cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); accord, Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (4th Cir.), Cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972), quoting United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970) ("proof of overt racial discrimination in employment is seldom direct"; "(r)ecognizing this, we have found 'error in limiting Title VII to present specific acts of racial discrimination' ")
 
 
 [48]
 NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 80, 555 F.2d at 1017. It is noteworthy, however, that Congress did not intend the creation of EEOC to "relieve any Government agency . . . of its . . . primary responsibility to assure nondiscrimination in employment as required by the Constitution and statutes . . . ." Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(e) (Supp. V 1975). The two agencies have recently agreed to a formal coordination of their responsibilities. See 46 U.S.L.W. 2500 (Mar. 28, 1978)
 
 
 [49]
 See notes 15-16 Supra and accompanying text
 
 
 [50]
 See notes 28-32 Supra and accompanying text
 
 
 [51]
 See Teamsters Int'l v. United States, supra note 45, 431 U.S. at 335-336 n.15, 97 S.Ct. at 1854-1855 n.15, 52 L.Ed.2d at 415 n.15; Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971) ("Congress directed the thrust of (Title VII) to the Consequences of employment practices, not simply the motivation" (emphasis in original))
 
 
 [52]
 See NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 81, 555 F.2d at 1018. Such statistics would certainly indict the licensee's commitment to meeting its affirmative action duty, however, and certain failures of this sort might well justify nonrenewal. See notes 25-26 Supra
 
 
 [53]
 Note, Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal, 89 Harv.L.Rev. 387, 394 (1975)
 
 
 [54]
 Social scientists commonly accept 1 in 20 as the maximum chance of erroneously rejecting random distribution, and a statistical showing less likely to mislead is considered to be significant. See Note, Supra note 53, 89 Harv.L.Rev. at 394-395 n.30, 400-401 n.58, citing Albermarle Paper Co. v. Moody, 422 U.S. 405, 433-434, 95 S.Ct. 2362, 2379, 45 L.Ed.2d 280, 305 (1975). A 1 in 40 chance of error has been suggested as the standard for "overwhelming" statistical showings. Bogen & Falcon, The Use of Racial Statistics in Fair Housing Cases, 35 Md.L.Rev. 59, 77 (1974)
 
 
 [55]
 P. Hoel, Introduction to Mathematical Statistics 108 (4th ed. 1971). See generally, H. Blalock, Social Statistics 159-165 (2d ed. 1972)
 
 
 [56]
 NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 80, 555 F.2d at 1017; see Focus Cable of Oakland, Inc., 65 F.C.C.2d 35, 43 (1977); Nondiscrimination 1969, supra note 23, 18 F.C.C.2d at 241
 
 
 [57]
 See H. Blalock, Supra note 55, at 163 (statistical significance is not the same as practical significance because in isolation it tells nothing about the importance or magnitude of the differences)
 
 
 [58]
 Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338, 359 (1966)
 
 
 [59]
 This explanation is especially likely when the challenger has proffered specific instances of discriminatory conduct, but such direct evidence of intent is not essential if the statistics alone are strong. Montlack, Using Statistical Evidence to Enforce the Laws Against Discrimination, 22 Clev.St.L.Rev. 259, 260 (1973); see Sweeney v. Board of Trustees of Keene State College, 569 F.2d 169, 175 (1st Cir. 1978) (statistics alone can fulfill burden of proof in individual disparate-treatment case)
 
 
 [60]
 See Note, Employment Discrimination: Statistics and Preferences Under Title VII, 59 Va.L.Rev. 463, 467 (1973). No innocuous explanations were proffered by the licensees at bar. Methods for determining the weight and employer gave various factors in making employment decisions are discussed in Note, Supra note 53
 
 
 [61]
 On the other hand, unlike most other employers, broadcasters operate under a requirement that they make affirmative efforts to increase their employment of women and minority individuals. See note 25 Supra. Thus a disparity in a broadcaster's employment profile is less likely to be the result of unintentional practices than would be the case for such differentials in the figures for other employers. See also Maj.Op. at note 49
 
 
 [62]
 Teamsters Int'l v. United States, supra note 45, 431 U.S. at 340 n.20, 97 S.Ct. at 1856 n.20, 52 L.Ed.2d at 418 n.20; accord, Nondiscrimination 1975, supra note 12, 54 F.C.C.2d at 362; Note, Supra note 53, 89 Harv.L.Rev. at 393 ("courts are willing to proceed as though discrimination explains the observed conditions even in the absence of direct evidence")
 
 
 [63]
 See Atchison, T. & S. F. Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350, 362-363 (1973); UAW v. NLRB, 148 U.S.App.D.C. 305, 317, 459 F.2d 1329, 1341 (1972); Distrigas of Mass. Corp. v. FPC, 517 F.2d 761, 766 (1st Cir. 1975). Fairly read, the Commission's brief discussion in this case
 is so perplexing as to sow doubt whether this is a process of reasoned policy making, with a change in direction put in effect for a navigational objective, or the confusion of an agency that is rudderless and adrift.
 Public Serv. Comm'n v. FPC, 167 U.S.App.D.C. 100, 115, 511 F.2d 338, 353 (1975).
 
 
 [64]
 Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 228-229 (noting that the zone of reasonableness contracts over time, but without telling us what its parameters now are)
 
 
 [65]
 See notes 73-75 Infra and accompanying text
 
 
 [66]
 Stone v. FCC, supra note 41, 151 U.S.App.D.C. at 161, 466 F.2d at 332
 
 
 [67]
 Id. at 161 & n.6, 466 F.2d at 332 & n.6. The use of general workforce statistics is legally acceptable because most broadcasting jobs involve skills "that many persons possess or can fairly readily acquire." Hazelwood School Dist. v. United States, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 3742 n.13, 53 L.Ed.2d 768, 777-778 n.13 (1977); see Note, The FCC's Role in Providing Equal Employment Opportunity for Minority Groups, 53 B.U.L.Rev. 657, 658 (1973)
 
 
 [68]
 See Black Broadcasting Coalition v. FCC, supra note 18; NOW v. FCC, supra note 8; Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC (Bilingual I), 160 U.S.App.D.C. 390, 492 F.2d 656 (1974)
 
 
 [69]
 One might, with the benefit of hindsight, argue that the court erred in creating so broad a zone of reasonableness, and that the mistake should now be corrected by the court En banc. After all, the zone in which we acquiesced in Stone comes close to labelling as reasonable statistics that "do more than speak for themselves they cry out 'discrimination' with unmistakable clarity." Muniz v. Beto, 434 F.2d 697, 702-703 (5th Cir. 1970) (figures showing 15 to 20% Of parity). And the full court's adoption of the "contracting zone" concept, see Maj.Op. at notes 16 & 33, might be taken as an implicit admission of earlier error, for statistics that give rise to an inference of intentional discrimination in 1978 had the same capability in 1972. Nonetheless, in Stone we dealt not only with a licensee that had made voluntary efforts toward equal opportunity, but also with one of the first challenged applications of a Commission policy formulated only four years earlier. See Bilingual I, supra note 68, 160 U.S.App.D.C. at 393, 492 F.2d at 659 ("Stone represented an initial effort, not a final codification(;) (w)hile we did not endorse the statistical challenge raised in Stone, we did not signal satisfaction with the status quo on employment discrimination"). It is not extraordinary for courts to allow something of a grace period before enforcing full compliance with newly-enunciated policy even if everyone should have known how to conduct himself before the law itself required conformance. Compare Brown v. Board of Educ. (Brown II), 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083, 1106 (1955) with Alexander v. Holmes County Bd. of Educ., 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 21 (1969)
 
 
 [70]
 Supra note 41
 
 
 [71]
 Stone v. FCC, supra note 41, 151 U.S.App.D.C. at 159, 466 F.2d at 330
 
 
 [72]
 Whether such a disparity is actually significant would depend on the number of station employees and the number of minority-group employees expectable in the absence of discrimination. See note 92 Infra; Ochoa v. Monsanto Co., 473 F.2d 318, 320 (5th Cir. 1973) ("the smallness of the numbers demonstrates that the Court was not compelled to allow such statistical showing to set in train the usual presumptions")
 
 
 [73]
 FCC responses, Supra note 27, at 1. A guideline beginning at 50% Of parity and increasing 5% Per year to a maximum of 90% Of parity was proposed in Note, Supra note 67. Although we have no call to discuss particular figures, such a stepped criterion seems a reasonable effort to combine the requirements of the antidiscrimination and affirmative-action rules. The Commission on Civil Rights argues for a test of 80% Of parity. United States Commission on Civil Rights, Supra note 8, at 151
 Licensees with fewer than ten employees are not rigidly subject to the Commission's 50% Guideline because the Commission believes that the sample size is too small to give rise to any statistically reliable finding. FCC Responses, Supra note 27, at 1-2. This would often but not always be true. See note 72 Supra.
 
 
 [74]
 The Commission currently requires licensees to report on employment practices in their "upper-four" job categories. Licensees as a whole have reported that fully 77.2% Of all broadcast employees occupied such positions in 1975, United States Commission on Civil Rights, Supra note 8, at 143, and we are in the dark as to why this may be so. Without elucidation, I can accept this startling statistic only as reflecting a distorted view of what jobs are important, making a mockery of any figures purporting to show that a licensee has an appreciable number of women or minority-group members in critical positions. Put another way, the most mundane jobs must often be classified as upper-level
 For instance, in this very case CBS asserts that women are proportionally represented in important positions because in 1975 half of all females occupied upper-four positions. This claim ignores the telling fact that of only 14 employees not in the highest categories all but one were women. This is hardly an "exemplary" performance. Contra, Brief for Intervenor CBS, at 12. Because statistics showing overall proportional employment may easily mask a design to keep minorities and women out of truly influential jobs and because those positions are the more likely to have an impact on programming, the Commission needs reliable information on upper-level employment. See NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 82, 555 F.2d at 1019. It has at long last decided to consider changes in its method of categorization. Petitions for Rule Making to Amend FCC Form 395 and Instruction, 66 F.C.C.2d 955 (1977).
 
 
 [75]
 The Commission has not explained why the parity guideline should differ for upper-level positions, and none is obvious to me. In fact, because the primary underlying concern is with programming, it would seem that the more important jobs should receive closest scrutiny by the Commission
 
 
 [76]
 For instance, the Supreme Court recently held that a showing that the percentage of Mexican-Americans selected for grand juries over a ten-year period in a Texas county was only 50% Of parity not only gave rise to an inference of intentional discrimination but made out a prima facie case in that regard. Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 50 L.Ed.2d 498 (1977); see Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (violation found although 62% Of parity); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (violation found on 33% Of parity). See also Washington v. Davis, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 608 (1976) (showing of intentional discrimination is a necessary element in establishing that Equal Protection Clause was breached in constituting jury)
 Particularly characteristic of the Commission's reasoning is its counsel's statement in oral argument that the agency uses the "zone of reasonableness" only to find out whether the figures promote an inference that something is wrong with a licensee's affirmative-action plan, and not to ascertain whether there is an indication of purposeful discrimination. See, E. g., Swanson Broadcasting, Inc., 42 Rad.Reg.2d (P&F) 1002 (Renewal Branch 1978) (although licensee's performance fails under 5 0/25 standard, renewal will be granted without hearing but with imposition of reporting conditions). The Commission will infer intentional misconduct only when the statistics unveil a situation so far outside the zone that it may be classified as egregious. Because statistics that do not seem sufficiently outrageous to the Commission often are probative of intentional discrimination, see, E. g., notes 88-92 Infra and accompanying text, the Commission's decision to assume in all such cases that ineffective affirmative action is the real culprit is totally arbitrary. The Commission has advanced this theory to justify prospective orientation in Bilingual II, but the court pays it the deference it truly deserves absolutely none. See Maj.Op. at note 49 ("the Commission could but speculate as to whether the disparities owed to intentional discrimination, unintentional discrimination, or chance").
 
 
 [77]
 Castaneda v. Partida, supra note 76, 430 U.S. at 495, 97 S.Ct. at 1280, 51 L.Ed.2d at 511 (figures showing 50% Of parity indicate "substantial under-representation")
 
 
 [78]
 The Commission's opinion does not clearly indicate that it reached this conclusion, see CBS, Inc., supra note 29, 56 F.C.C.2d at 302, but the Commission's brief on appeal endeavors to remove the uncertainty. See note 79 Infra and accompanying text. See also note 94 Infra
 
 
 [79]
 Brief for Appellee FCC in No. 75-2181, at 12. Even a brief perusal of the Commission's opinion shows that it did not make the kind of zone-of-reasonableness comparison between the percentage of KCBS's employees who were Asian-American and that for the general labor force that it made for the overall minority population. The Commission has subsequently indicated that it may not look even at figures for a single dominant group, but only to those for all minorities in toto. Rahall Broadcasting of Indiana, Inc., 66 F.C.C.2d 295, 296 (1977)
 
 
 [80]
 Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, supra, note 25, 44 F.C.C.2d at 735-736. Compare Mitchell v. United States, 313 U.S. 80, 94, 97, 61 S.Ct. 873, 877, 878, 85 L.Ed. 1201, 1210, 1212 (1941)
 
 
 [81]
 Compare National Broadcasting Co., supra note 58, 58 F.C.C.2d at 425 n.11 ("our own scrutiny of the station's EEO performance, we believe, must extend in some measure to All protected groups" (emphasis supplied)); Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, supra note 28, 44 F.C.C.2d at 735-736. ("(N )O person may be denied employment or related benefits on the grounds of his or her race, color, religion, national original or sex" (emphasis in original)); Nondiscrimination 1970, supra note 10, 23 F.C.C.2d at 432 n.2 (concern is with all minorities, not just the largest group); Nondiscrimination 1968, supra note 9, 13 F.C.C.2d at 770 ("(a) refusal to hire Negroes or persons of Any race or religion clearly raises a question of whether the licensee is making a good faith effort to serve his entire public" (emphasis supplied))
 When the Commission first became concerned with discrimination against women, it stated that owing to its limited resources it would continue to focus on blacks, Indians, Mexican-Americans and Asian-Americans but not women. Nondiscrimination 1970, supra note 10, 23 F.C.C.2d at 431. See Also Nondiscrimination 1969, supra note 23, 18 F.C.C.2d at 244 (Asian-Americans listed as one of the "significant minority groups"). Now, however, without explanation, the Commission separately considers statistics for women but seemingly not for Asian-Americans.
 
 
 [82]
 Maj.Op. at note 7. The court says that the Commission is not permitting discrimination aimed at small groups but is merely rejecting statistical evidence for those groups. Because there is no justification for rejecting All statistics for All small groups in All situations, see note 86 Infra, and because direct evidence of discrimination is seldom if ever obtainable, see text accompanying notes 46-47 Supra, refusing to accept their statistical presentations is an effective abandonment of concern for small groups. When the Commission is checking up on a licensee in the absence of a challenger's contentions related to a specific group, a look to the overall statistics might well be a reasonable step, but here we have specific allegations related to a single group
 
 
 [83]
 Historically, the smallest groups have often been those most heavily victimized by racial prejudice
 
 
 [84]
 See notes 16-20 Supra and accompanying text
 
 
 [85]
 See Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 683-684 (1971) (licensee must determine "what groups constitute the community" and ascertain problems of those that are "significant," as measured by size, influence and other factors). Ironically, the Commission in this very case assumed that KCBS had a duty to ascertain and attempt to meet the programming needs of not only Asian-Americans but also the even smaller group of Chinese Americans. CBS, Inc., supra note 29, 56 F.C.C.2d at 296-301; see Joint Appendix (J.App.) 132
 
 
 [86]
 On the Commission's behalf, the court posits the rationale that "such small percentages generally will provide no meaningful basis for comparison with the workforces of most radio stations, which often employ only 25 to 75 workers." Maj.Op. at note 7. Yet the sample size is actually much larger, for over the three-year license term many employees come and go. Moreover, we do not even know where the "25 to 75" figure came from. Even if the statistics for such stations would often be unreliable, that would be no reason to reject those statistical presentations, like the one in this case, that undeniably are meaningful. And even if one accepts the court's rationale, it does not rescue the Commission in this case, since KCBS employed more than 75 workers
 As a general matter, the value of a statistical showing depends not merely upon the size of the sample but also upon the extent of the expected observation and the degree of disparity elements unknowable until the Commission looks at the particular group's statistics. In short, as the application of the logic of statistics that it purports to be, the court's conclusion that statistics for small groups are always unreliable is simply wrong.
 Curiously, the court somehow later concludes that Asian-Americans constitute "a significant minority group." Maj.Op., --- U.S.App.D.C. at ----, 595 F.2d at 631. I am not sure how a significant group differs from a dominant one and why statistical evidence as to this significant group should not have been accepted even under the theory the court supplies for the Commission.
 
 
 [87]
 See note 60 Supra and accompanying test
 
 
 [88]
 CBS questions this statistic, arguing that the correct figure is 6.2%. Brief for Intervenor CBS in No. 75-2181, at 4 n.6. Because the Commission did not reject CAA's figure, it must be accepted for present purposes
 
 
 [89]
 The use of Standard Metropolitan Statistical Area figures is proper in cases in which the labor force in that region reasonably approximates that from which the licensee draws its employees. See Stone v. FCC, supra note 41, 151 U.S.App.D.C. at 161, 466 F.2d at 332. In this case, 6.9% Should be considered a "strong" figure since the percentage of Asian-Americans in the city itself is much higher
 
 
 [90]
 Due to the inadequacies of the Commission's reporting form, see note 91 Infra, we do not know how many employees worked for KCBS during the license term. We do know that about 83 workers were employed on the average at any one time, that the average Asian-American left after nine months and that the turnover rate for Asian-Americans was only "relatively high." See Maj.Op. text at note 43. Even assuming that the tenure for all employees averaged a third again longer than that for Asian-Americans, we have a total sample of 249 employees, 6.9% Of which is roughly 17
 
 
 [91]
 CBS, Inc., supra note 29, 56 F.C.C.2d at 302, P 19. The minority-employment reports initially filed by KCBS with the Commission disclosed the employment of only one Asian-American during the license term and that for only a short time. After CAA challenged this as being totally disproportional, KCBS responded that nine others had actually been employed but for various reasons had not appeared on the earlier report forms. While CAA did not contest the accuracy of this claim, the Commission requested of KCBS and received further explanatory and supplementary information. See Maj.Op. text at notes 6-11. One of the nine was a Filipino, and the parties disputed whether he should be classified as an Asian-American. See Opposition of CAA to Motion to Dismiss and Reply to Opposition of CBS, Inc., at 20 n.1 (Dec. 20, 1974), J.App. 174 n.1. But see CAA's Petition to Deny at 7 (Nov. 1, 1974), J.App. 15. The Commission apparently assumed that he should not, concluding that only "eight individuals were hired who do not appear" on the reporting forms. CBS, Inc., supra note 29, 56 F.C.C.2d at 302. The court now implicitly overturns this, finding that nine Asian-American employees originally were unreported. Maj.Op., 193 U.S.App.D.C. at ----, 595 F.2d at 631; see Id. at notes 9-10 and accompanying text. Nonetheless, inclusion of this employee in the Asian-American category does not materially alter the statistical outcome. See note 92 Infra and accompanying text
 Although I am unable to accede to the court's conclusion that there were really ten Asian-American employees and not just nine, I see nothing unreasonable in the Commission's evident feeling of general satisfaction with KCBS's explanation of why the data had not appeared earlier. Nonetheless, the fact that the Commission deemed further information necessary indicates a substantial defect in the reporting system. As KCBS itself put it, "Form 395 is, at best, an imperfect measure of a station's good faith efforts to provide equal employment opportunities. Because the Form 395 provides for a listing of employees as of a single payroll period each year, it cannot reflect employees who are not with the station during the designated payroll period." Motion to Dismiss and Opposition of CBS, Inc., at 21 (Nov. 27, 1974), J.App. 149. The report would be more useful if it reflected employees who come and go in the interim between current reporting periods and if it also called for applicant flow data information on the characteristics of every person who applied during the preceding year. See B. Schlei & P. Grossman, Employment Discrimination Law 1165 (1976), quoting Hester v. Southern Ry., 497 F.2d 1374, 1379 (5th Cir. 1974) ("(t)he most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired").
 
 
 [92]
 In the absence of Commission adoption and justification of some other standard of statistical significance, we are left to rely upon what social statisticians traditionally have accepted. See note 54 Supra. The figure in text was arrived at by using the chi square test. See P. Hoel, Supra note 55, at 298. See also F. Mosteller, R. Rourke, G. Thomas, Probability with Statistical Applications 494 (2d ed. 1970) (binomial distribution chart). This result is close to the upper boundary of normally acceptable type I error, see note 54, Supra, but I am unwilling to ignore it until the Commission provides a reasoned explanation for why it is in the public interest to do so. And if the Commission should decide to exclude the Filipino, the result would become even more compelling
 Just looking at the 1974 figures alone, as the court challenges me to do, the evidence still indicates discrimination. Accepting KCBS's corrections as true, still only one Asian-American was employed in May of 1974 when the 1974 report was submitted. This is barely more than 1% Of KCBS's employees and should be compared to an expected (in the absence of discrimination) figure of nearly six.
 The computations could also be made on the basis of person/months, using an expected figure of 206 and an observed frequency of no more than 94. These figures are arrived at without too much difficulty from the information available to the Commission. The license term in question ran from December 1, 1971, through November 30, 1974. The eight unreported Asian-Americans were employed during that time for a total of approximately 34 person/months. See CBS, Inc., supra note 29, 56 F.C.C.2d at 302; Appendix to Letter from Eleanor S. Applewaite, General Attorney, CBS, Inc., to Richard J. Shiben, Chief, FCC Renewal and Transfer Division (Oct. 3, 1975), J.App. 208. The one reported Asian-American could not have worked more than 18 months during the license term. Compare Memorandum of CBS in Response to a Question Raised in the Department of Justice Amicus Brief, appendix at 6-7 with Id., appendix at 11-12. The Filipino employee may have worked as many as 42 months.
 Using the test employed by the Supreme Court in Castaneda v. Partida, supra note 76, 430 U.S. at 496-497 n.17, 97 S.Ct. at 1281 n.17, 51 L.Ed.2d at 512 n.17, and in Hazelwood School Dist. v. United States, supra note 67, we arrive at a standard deviation of about 13. The gross disparity is thus approximately 9 standard deviations and nearly 12 if we exclude the Filipino, see note 91 Supra and "the hypothesis that the (employment practices were) random would be suspect to a social scientist." Castaneda v. Partida, supra note 76, 430 U.S. at 496-497 n.17, 97 S.Ct. at 1281 n.17, 51 L.Ed.2d at 512 n.17. Using a person/month as the sample measurement factors in the length of the employees' stay, the shortness of which might be due to intentional discrimination. The choice of months as the unit of time is somewhat arbitrary, however, and, if we are concerned primarily with hiring practices, person/month figures are misleading because each unit is not tied to an independent hiring decision.
 
 
 [93]
 See notes 78-79 Supra and accompanying text
 
 
 [94]
 The court is perhaps confused by the fact that the Commission did look into the employment of Asian-Americans, but the reason it did so was not to explain intentional discrimination but to determine whether the licensee's affirmative action plan was working. See CBS, Inc., supra note 29, 56 F.C.C.2d at 302, quoted in note 95 Infra. See also note 28 Supra (actual employment results are the best test of effectiveness of affirmative action program). Admittedly, I am at a loss to understand why the Commission itself would not apply its antidiscrimination rule to small minority groups to the same extent that it imposes its affirmative action requirement. Our failure to insist that the Commission explain itself allows it to engage in reasoning so murky that the court interprets it in two contradictory ways. Compare Maj.Op. at note 7 (Commission refused to examine statistically-based contentions of discrimination against Asian-Americans) with Id. at note 42 ("the Commission examined statistics on the Number of Asian-American . . . employees during the term"). See also notes 78-79 Supra and accompanying text. Although the court believes that "clear guidelines . . . are essential," Maj.Op. at note 7, it apparently is not sure exactly what the Commission did do in this case
 
 
 [95]
 CBS, Inc., supra note 29, 56 F.C.C.2d at 302. In response to the contention of conscious discrimination against Asian-Americans, the Commission reasoned:
 At present, according to the 1975 form 395 report, KCBS employs one male and two female Orientals, all of whom are professionals. Overall, of KCBS' 84 full-time employees, 29.8 percent are female and 23.8 percent belong to racial or ethnic minority groups. The 1975 report also shows within the upper four job categories eight male and six female employees from minority groups. These figures represent 13.6 and 24.0 percent respectively of the overall full-time employment (58 male and 25 female) at KCBS; there are six other minority employees presently holding full-time office and clerical positions.
 . . . The combination of licensee's Current performance in hiring and promotion, as reflected on the 1975 annual employment report, and its explanation for the low numbers of Asian-Americans appearing on reports for 1971-74, suffice to show that KCBS' EEO results numbers of protected-group employees, Viewed in the light of an affirmative action program are within a zone of reasonableness, and that Its past record, while characterized by high job turnover, reflects a willingness to hire minority individuals. Without more, we cannot say this failed to comply with our EEO rules and policies.
 Id. (emphasis supplied and footnotes omitted).
 
 
 [96]
 Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), Cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (courts must insist "that the agency articulate with reasonable clarity its reasons for decisions, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination"); see Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 88, 439 F.2d 584, 589 (1971); K. Davis, Administrative Law of the Seventies § 6.13, at 223-225 (1976)
 
 
 [97]
 Central Power & Light Co. v. FERC, 188 U.S.App.D.C. 56, 58, 575 F.2d 937, 939 (1978) ("(o)ur judicial function embraces ruling on what we fairly discern as the basis of the Commission's action, but it does not include speculating on the Commission's intentions"). That philosophy has been one of the guiding lights for our court:
 The inadequate explanation afforded this particular administrative action gives us no opportunity for intelligent review. Instead, this court is left with a dilemma: we could uncritically approve the agency action, which would amount to a failure to perform properly the duty of a reviewing court. On the other hand, we could search out this matter on our own, which would very probably result in the substitution of a judicial judgment for an administrative judgment. This dilemma can be avoided only if agencies provide an adequate explanation of the basis for the action which they take.
 Humboldt Express, Inc. v. ICC, 186 U.S.App.D.C. 141, 144, 567 F.2d 1134, 1137 (1977).
 
 
 [98]
 A hearing is unnecessary if the Commission can reach an informed decision after some less burdensome means of inquiry. See note 41 Supra and accompanying text. The choice of method be it predesignation discovery or something else is up to the Commission, see note 3 Supra, but if the method employed is inadequate the failure to accord a hearing must be reversed. Bilingual I, supra note 68, 160 U.S.App.D.C. at 393, 492 F.2d at 659
 
 
 [99]
 Id. at 393, 492 F.2d at 659. See also notes 45-47 Supra and accompanying text
 
 
 [100]
 Cf. Office of Communication of United Church of Christ v. FCC (UCC II ), 138 U.S.App.D.C. 112, 116, 425 F.2d 543, 547 (1969)
 
 
 [101]
 E. g., FCC Responses, Supra note 27, at 3 ("the Commission does . . . recognize that there has In the past been job discrimination" (emphasis supplied))
 
 
 [102]
 See CBS, Inc., supra note 29, 56 F.C.C.2d at 302 quoted in note 95 Supra
 
 
 [103]
 Compare Town & Country Radio, Inc., 41 Rad.Reg.2d (P&F) 151, 161, Aff'd on reconsideration, 41 Rad.Reg.2d (P&F) 1177, 1180 (Rev.Bd.1977) (presence of numerous women employees is irrelevant to question of discrimination against blacks)
 
 
 [104]
 The Commission relied upon post-term statistics in looking at the overall minority-employment picture. See notes 110-116 Infra and accompanying text. These statistics were appreciably better than the in-term figures, but still they only approached parity. In 1975, 23.8% Of KCBS's full-time employees were from majority groups, compared to 25.8% Of the area workforce. Similarly, the percentage of women in the area workforce was 38.4% And at the station was 29.8%, or approximately 78% Of parity. Minority-group employees filled only 20% Of the upper-four positions; women totalled a little over 17% Of such employees, or less than 45% Of parity. The Commission concluded simply that the overall figures were within the zone of reasonableness. CBS, Inc., supra note 29, 56 F.C.C.2d at 302, quoted in note 95 Supra
 
 
 [105]
 See Hazelwood School Dist. v. United States, supra note 67, 433 U.S. at 318, 97 S.Ct. at 2747, 53 L.Ed.2d at 783-784 (Stevens, J., dissenting)
 
 
 [106]
 Note, FCC Failure to Eradicate Employment Discrimination by Broadcast Licensees, 21 St. Louis U.L.J. 150, 156 (1977) (despite its past statements, the Commission's practice indicates that it does not believe statistics can show intentional discrimination); see, E. g., Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 230 n.6. The court seems to sympathize with this unexplained dislike of statistical showings that are anything less than overwhelming. See Maj.Op. text at notes 32-33
 
 
 [107]
 Bilingual I, supra note 68, 160 U.S.App.D.C, at 392-393, 492 F.2d at 658-659; see Columbia Broadcasting Coalition v. FCC, supra note 41, 164 U.S.App.D.C. at 222, 505 F.2d at 329. See also Stone v. FCC, supra note 41, 151 U.S.App.D.C. at 159, 466 F.2d at 330; Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 229; Inquiry Into the Employment Practices of Certain Broadcast Stations Located in Florida, supra note 25, 44 F.C.C.2d 736-737
 
 
 [108]
 See note 26 Supra
 
 
 [109]
 CBS, Inc., supra note 29, 56 F.C.C.2d at 302 n.13. The court says that the plan was effective, Maj.Op. at note 42 and accompanying text, but the Commission's opinion indicates no more than that a plan existed on paper
 
 
 [110]
 See CBS, Inc., supra note 29, 56 F.C.C.2d at 302, quoted in note 95 Supra
 
 
 [111]
 See Maj.Op. at note 41 and accompanying text. Compare Id. at note 49 (paradoxically rejecting reliance on post-term statistics in Bilingual II ). In explanation, the court does mention in-term statistics for overall minority hiring, see Maj.Op. at note 42, but the Commission's opinion relies solely upon the post-term, 1975 figures. The court is simply taking over the agency's function when it attempts to find an acceptable basis for renewal in the in-term statistics not dealt with by the Commission. Compare, E. g., Gulf States Utils. Co. v. FPC, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635, 647 (1973), quoting FCC v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943) (reviewing court may not advance "an alternative, unstated ground to support an agency's decision if that ground is one that 'the agency alone is authorized to make' ")
 
 
 [112]
 NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 82, 555 F.2d at 1019
 
 
 [113]
 Black Broadcasting Coalition v. FCC, supra note 18, 181 U.S.App.D.C. at 184 & n.3, 556 F.2d at 61 & n.3
 
 
 [114]
 Alianza Federal de Mercedes v. FCC, 176 U.S.App.D.C. 253, 255 & n.6, 539 F.2d 732, 735 & n.6 (1976); see Nondiscrimination 1976, supra note 8, 60 F.C.C.2d at 246; Cf. UCC I, supra note 32, 123 U.S.App.D.C. at 341, 359 F.2d at 65
 
 
 [115]
 See notes 29-32 Supra and accompanying text
 
 
 [116]
 Because employment practices are relatively enduring in nature, it may be that the threat of temporary renewal-time changes to gain Commission approval is somewhat less obnoxious than it is with regard to programming. See NOW v. FCC, supra note 8, 181 U.S.App.D.C. at 83, 555 F.2d at 1020. On the other hand, it does seem that nearly all Asian-Americans employed at KCBS for one reason or another left much sooner than did most employees. Furthermore, the post-term data in this case still revealed a substantial disparity, see note 104 Supra and accompanying text, so that, even if post-term evidence of parity could be given some weight, this is not the case in which to do so
 
 
 [117]
 CBS, Inc., supra note 29, 56 F.C.C.2d at 302, quoted in note 95 Supra. I agree with the court that a sophisticated "revolving door" challenge to the renewal of KCBS's license is precluded by the exhaustion doctrine. See Maj.Op. text at notes 47-48
 
 
 [118]
 Castaneda v. Partida, supra note 76, 430 U.S. at 493, 97 S.Ct. at 1279, 51 L.Ed.2d at 509-510
 
 
 [119]
 Note, Supra note 53, 89 Harv.L.Rev. at 394
 
 
 [120]
 Cf. Barnes v. Costle, 183 U.S.App.D.C. 90, 100-101, 561 F.2d 983, 993-994 (1977)
 
 
 [121]
 Cf. Mitchell v. Rose, 570 F.2d 129, 133 (6th Cir. 1978) (discussing the "common misconception" that the presence of some blacks on grand juries removes the possibility that unconstitutional intentional discrimination has occurred)
 
 
 [122]
 Cf. Black Broadcasting Coalition v. FCC, supra note 18, 181 U.S.App.D.C. at 187 n.21, 556 F.2d at 64 n.21